COMMONWEALTH *vs.* MYER J. LEVINE & another.

Bristol.     May 13, 1932. — June 30, 1932.

Present: CROSBY, PIERCE, WAIT, FIELD, & DONAHUE, JJ.

*Larceny,* By false pretence, Conspiracy. *Evidence,* Competency, Secondary, Hearsay, Of bank account. *Witness,* Refreshment of recollection. *Practice, Criminal,* Exceptions.

At the hearing together by a judge without a jury of indictments charging two defendants with larceny and conspiracy to steal, there was evidence that one of the defendants was the treasurer of a corporation, the bank account of which was kept in his name; that the other defendant ordered certain quantities of white lead and linseed oil of a dealer in such goods, leading the dealer's salesman to believe that the goods were being purchased by the corporation for immediate use in reconditioning its buildings; that the goods were shipped by the dealer and arrived at a wharf within the time specified by the second defendant; that the freight was paid by a check of the first defendant; that none of the goods were used on the buildings of the corporation, but within a few days after delivery at the wharf were sold to various purchasers at prices slightly less than the purchase prices fixed by the dealer, delivery to such purchasers being made by truck either directly from the wharf or from the premises of the corporation, to which some of the goods had been taken from the wharf; that checks of the purchasers in payment were deposited in the account of the first defendant; that invoices from the dealer, bills to purchasers and checks from purchasers were entered on the

books of the corporation where the first defendant, as its treasurer, could have discovered them; that, when questioned as to the transaction by a director of the corporation, the first defendant gave an equivocal answer; and that the dealer was not paid for the goods. *Held,* that

(1) The evidence as to what was done with the lead and oil after their delivery by the dealer was competent in the circumstances because it had some tendency to show a single scheme and an intent from the beginning to obtain the goods from the dealer by false pretences: the evidence was not incompetent because it also admitted of an explanation consistent with innocence;

(2) A witness having testified that he received a check for the freight bearing the name of the first defendant, and the defendants having failed to produce the check upon call by the district attorney, there was no error in permitting the witness to describe the check;

(3) Although the testimony as to such check would not support a finding that the first defendant signed the check, the testimony was relevant in the circumstances with relation to the alleged contract of sale by the dealer;

(4) The trial judge having admitted testimony that the second defendant believed what he told the dealer's salesman to be true, there was no error in the exclusion of testimony by that defendant to show the grounds of his belief, such testimony excluded having relation to newspaper articles which that defendant had read and to statements made to him by others;

(5) A finding was warranted that there was no *bona fide* purchase of the goods from the dealer by the corporation, but that the defendants were the real purchasers under the guise of the corporation and obtained a title to the goods by false pretences;

(6) G. L. c. 266, § 35, did not aid the defendants in the circumstances;

(7) The evidence warranted findings that both defendants were guilty on each indictment.

There was no merit in an exception, saved by the defendant at the trial of an indictment, to the admission of evidence which did not result in his prejudice.

Where, at the trial of an indictment against several defendants, evidence was admitted only against one of them, who was acquitted, an exception to the admission of such evidence by other defendants who were found guilty must be overruled.

At the trial of an indictment, evidence of deposits in and withdrawals from a certain bank account was relevant to the issues raised. The head bookkeeper of the bank testified that he had custody of its books of account and that deposits and withdrawals were entered under his supervision and that, as part of his duty, he personally supervised such account and the checks drawn against it; that he had no personal knowledge of certain entries in the account, which were made by another clerk; and that he participated in preparing a transcript of the account by reading off the entries from the ledger to a clerk who set them down. Refreshing his recollection from the transcript, he was permitted to testify of his own knowledge as to deposits in and

withdrawals from the account. The transcript was excluded by the trial judge. *Held*, that there was no error in the admission of the witness's testimony as to the deposits and withdrawals.

An exception at the trial of an indictment, to the exclusion of testimony which later is admitted, must be overruled.

Two INDICTMENTS, found and returned on June 4, 1930, and described in the opinion, against David Remick, Francis P. McIntyre, Myer J. Levine and Samuel Bolusky.

The defendants having waived a trial by jury, the indictments were heard together in the Superior Court by *T. J. Hammond*, J. Material evidence is stated in the opinion. The defendants Remick and McIntyre were found not guilty. The defendants Levine and Bolusky were found guilty and alleged exceptions.

The case was argued at a sitting of this court on May 13, 1932, before *Wait, Sanderson, Field,* & *Donahue*, JJ., and after the death of *Sanderson*, J., was submitted on briefs to *Crosby* & *Pierce*, JJ.

*J. C. Johnston*, for the defendants.

*F. E. Smith*, Assistant District Attorney, for the Commonwealth.

WAIT, J. The defendants Bolusky and Levine were indicted with one Remick and one McIntyre in two counts charging that they "did steal a quantity of white lead and linseed oil of the value of more than one hundred dollars of the property of the National Lead Company." In another indictment the same men were charged in a single count, that they "did conspire together to steal" the same property. Trial by jury was waived. The cases were tried together. The judge found Remick and McIntyre not guilty, but both Bolusky and Levine guilty on the second count of the first indictment and upon the second indictment. The cases are before us upon exceptions to refusals to find Bolusky and Levine not guilty; to refusals to rule as requested; and to certain rulings in the admission and exclusion of evidence.

The Commonwealth specified, orally, that it relied upon, as facts, that the defendants represented that certain buildings and the real estate on which they stood were

owned by the Massachusetts Thread Mills, Inc., and that the white lead and oil, the subject matter of the larceny, were to be used in painting the buildings so alleged to be owned; and further that the contract between the Massachusetts Thread Mills, Inc., and the National Lead Company made through Bolusky was not a *bona fide* contract but was part of a general plan and scheme of the defendants to obtain the goods without paying for them.

It was agreed that the Massachusetts Thread Mills, Inc., and the National Lead Company were corporations duly organized, the former under the laws of this Commonwealth, the latter under the laws of New Jersey; that the goods in question were obtained through the office or agent of the National Lead Company located in New York City. They had not been paid for, and none of them was used in painting by the Massachusetts Thread Mills, Inc.

There was evidence that in consequence of an order given at Boston by Bolusky to a salesman of the National Lead Company, that company shipped three hundred and sixty kegs of white lead and thirty-two drums of linseed oil from New York consigned to the Massachusetts Thread Mills, Inc., at Fall River, where truckmen, after paying the freight, took it away. Lischner, for the Commonwealth, testified that he was engaged in the trucking business at Fall River and knew the defendants. He called at the wharf in Fall River and found in his box a notice relating to the consignment. He had done business for the Massachusetts Thread Mills, Inc. Bolusky spoke by telephone to him, but he went to the wharf because told by his bookkeeper that the Massachusetts Thread Mills, Inc. called him up. He paid the freight before delivery of the goods. His men took two loads to a barn on premises used by the Massachusetts Thread Mills, Inc. He personally delivered one keg at the office of the Massachusetts Thread Mills, Inc., which he "left . . . on the top of the stairs and hollered: 'There is a keg.'" He heard someone say "All right," but saw no one, and went away at once. He called up one Fitton, who did out of town trucking for him. Subse-

quently he received a check from the Massachusetts Thread Mills, Inc., for services and expenses; but did not know whose check it was, nor who was present when he got it.

The judge admitted questions designed to bring out that the witness had at some time said that the check was Levine's personal check, and that Remick, Bolusky and Levine were present when he received it. The witness denied so doing. There is no merit in the exception claimed to the ruling admitting the questions and answers. No prejudice resulted. Fitton testified that he received a telephone call from Lischner's office to send as many trucks as he could to the wharf. He sent two which loaded thirty-two drums of linseed oil. Against objection and exception he was permitted to testify that he had a conversation by telephone with Remick. This was admitted against Remick alone. As he was acquitted, these defendants have no good exception. They were not affected.

Garrity, LeClair and Bell, truckmen employed by Fitton, testified to getting loads of lead and oil at the wharf and taking them to Boston and Winthrop; to making deliveries of portions to the Metropolitan Hardware and Paint Company and the Reliable Hardware Company; and to meeting at Boston a man who looked like Bolusky to whom Garrity gave Fitton's bill and by whom he was told to "Send it to the Massachusetts Thread." Other truckmen witnesses testified to getting lead and oil from the barn on premises used by the Massachusetts Thread Mills, Inc., and taking it to Taunton and to Roxbury. There was evidence of sales made at these places of delivery, after negotiations with Bolusky, at prices slightly lower than the price fixed by the order to the National Lead Company. Checks showing payment for these deliveries were introduced in evidence, as were also receipts signed by Bolusky.

The defendants contend that the evidence of dealings with the lead and oil after delivery by the National Lead Company was admitted erroneously. We find no error. There was evidence that on November 26, 1929, Williams, a salesman of the National Lead Company, met Bolusky at the Boston office of Massachusetts Thread Mills, Inc.,

by appointment. They discussed a possible purchase. Bolusky said, "we not only own properties in Fall River but we own other properties at Plympton, Massachusetts, and elsewhere"; and, on inquiry as to the condition of business, said "they had more orders than they could fill and were very anxious to get their mill at Fall River reconditioned for that reason and that a painter or painters were going to begin work December 3." Williams was led to believe that the lead and oil were to be used in painting the buildings used by the Massachusetts Thread Mills, Inc., and to be there used at once. In view of evidence to this effect, it was competent to show what was, in fact, done with the lead and oil, as basis for finding that the representations were knowingly false and intended to deceive, so that the property could be obtained and immediately turned into money. Action by Bolusky after the delivery of the goods at Fall River consistent with negotiations entered into by him before such delivery for sales of the lead and oil which actually were made immediately after the delivery, had some tendency to show a single scheme to defraud by false pretences in obtaining the goods from the National Lead Company. The evidence was not incompetent because it admitted of an explanation consistent with innocence. The goods reached Fall River on December 2, 1929, in time for use upon buildings used by the Massachusetts Thread Mills, Inc., beginning December 3, yet by December 12 all had been sent away from Fall River, sold to scattered purchasers in Boston, Winthrop and Taunton at less than the price contracted to be paid to the National Lead Company. Not a pound or a quart had been used for the purpose represented on November 26 as the intended use. What had been done was some evidence of what had been, in fact, the intent from the beginning.

An agent of The New England Steamship Company, which had transported three hundred sixty kegs of white lead and thirty-two drums of linseed oil sent by the National Lead Company consigned to the Massachusetts Thread Mills, Inc., at Fall River, testified that he was in

charge of checking freight at Fall River and kept records of arrival and shipment of freight; that the goods arrived on December 2; that on December 5 one keg was delivered to Lischner; thirty-two drums of oil to LeClair; one hundred twenty-nine kegs to Joseph Warnett and thirty kegs to J. Bliss (the last two being truck drivers for Lischner); that on December 6 two hundred kegs were delivered to William Garrity, and that the freight and storage charges were paid by a check of $162. He was asked: "Whose check was it?" Against the objection and exception of the defendants, he was allowed to answer: "I can testify that the check carried the signature of M. J. Levine." The district attorney called for the production of the check, but counsel for defendants stated it was not in possession of the defendants. Thereupon the witness was permitted to describe the check; and testified that a check signed "M. J. Levine" was offered to him for payment of the freight charges, but that he did not know on what bank it was drawn. It was agreed that at this time Myer J. Levine was treasurer and director of the Massachusetts Thread Mills, Inc. Lischner had previously testified that he had received a check in an envelope, and gave it to the steamship company for the freight.

There was here no error. No request, so far as appears, was made that the evidence be confined to any particular point. The witness could describe the paper check received by him in payment for the freight including the writing upon it. So far, at least, the evidence was admissible, after the failure to produce the paper. Whether the words "M. J. Levine" were upon what was received, if anything was received, was matter of fact. Standing alone such evidence would not support a finding that the words "M. J. Levine" were written by the defendant Levine or bound him as his signature. It was competent, nevertheless, to show that a paper purporting to be a check for $162, and bearing the name of M. J. Levine in the place for a signature was taken by the witness for the freight. The matter was relevant with relation to the alleged contract, which bore the words, "freight allowed."

One Washington, called by the Commonwealth, testified that he was head bookkeeper of the Boston National Bank and had custody of its books of account. He had with him a transcript of what he alleged to be the account of the defendant M. J. Levine, whom he knew by sight and had seen around the bank. He produced a signature card which was put in evidence. Refreshing his recollection from the transcript, he was allowed to testify that deposits and withdrawals were entered under his supervision and that, as part of his duty, he personally supervised Levine's account and the checks drawn against it, and kept a record of his standing with the bank as to the amount of money that he had in the bank; that, on December 7, a check for $162 drawn against that account by M. J. Levine was paid, and that specific checks (previously put in evidence and given by purchasers of the lead and oil who had testified to giving them in payment for bills from the Massachusetts Thread Mills, Inc., for the lead and oil, some of which had been sent or delivered on receipts signed by Bolusky) had been deposited in the M. J. Levine account at dates stated. On cross-examination, he testified that large numbers of checks come in, brought by messengers from the clearing house, that he receives them and distributes them to bookkeepers who examine and enter them; that he could not say he examined the check for $162 or that it came under his personal notice. The examining clerks work where he can see them; but he could not say they looked at each individual check. The original entry was made by Walter Casey, a billing clerk. He testified that "his statement that a check for $162 came in on that day was merely an inference from the fact that he found the record in the transcript of the ledger page; that he had no personal knowledge of it in the sense that personal knowledge means knowledge from seeing the checks." He took part in preparing the transcript by reading off the entries from the ledger to a statement clerk who took them down on the statement machine. The transcript was excluded; but the judge refused to strike out the testimony of the witness with regard to the entries.

We find no reversible error. The transcript properly was excluded. *Commonwealth* v. *Perry*, 248 Mass. 19, 29. The testimony, however, of the officer responsible for knowledge of the state of the Levine account, refreshed by his examination of the ledger and of the transcript made by him from it, was admissible. He gave the testimony as of his knowledge. It is immaterial that he personally did not make the memorandum by which his mind was refreshed; nor is it essential that it should be an original writing. *Commonwealth* v. *Ford*, 130 Mass. 64. The fact finding tribunal could find that charged with knowing what checks passed into the bank or were charged to a depositor's account, and assisted by looking at a record for the keeping of which he was responsible, the witness possessed the knowledge to which he testified. Such facts as cast doubt on his credibility were brought out fully by the cross-examination. The defendants properly did not insist on the fact that a transcript instead of the books themselves was used by the witness. *Commonwealth* v. *McDermott*, 255 Mass. 575, 581. See *Commonwealth* v. *Slavski*, 245 Mass. 405, 413.

It was stipulated that indorsements on the purchasers' checks given in payment (one of which read "for deposit to the order or credit of M. J. Levine" and another "pay to the order of M. J. Levine") were in the hand of McIntyre. None showed indorsement by Levine himself. They were admitted only against the defendants whose signatures appeared in indorsements upon them. The defendant McIntyre testified, in substance, that he never discussed the matter of this lead and oil purchase with Levine, Bolusky or Remick, that he first knew of it from invoices from the National Lead Company which he entered upon the books of the Massachusetts Thread Mills, Inc., of which he was bookkeeper; that, later, he entered the invoices and sales to the various purchasers, still later received checks in payment and made appropriate entries on the books. He testified that from December 1, 1929, to avoid an attachment, the bank account of the corporation was carried in the name of M. J. Levine, who left with him checks signed in blank to be filled as needed under instructions from Gardner,

the manager. It was agreed that $5,500 was drawn by McIntyre from the account in the name of Levine in payment of bills alleged to be of the Massachusetts Thread Mills, Inc. Levine rested without going upon the stand at the conclusion of McIntyre's testimony.

Evidence was offered by Bolusky that he was directed by Gardner, the manager, to recondition the mills and buy what was necessary; that from newspaper articles seen by him he knew the Massachusetts Thread Mills, Inc., had bought the premises and buildings which it occupied, and that he was directed by Miss Carmody, a clerk at Boston, who asserted she was communicating Gardner's instruction, to sell the lead and oil, because negotiations for a reorganization and amalgamation with Rosoff interests in New York had fallen through. This was excluded. He testified, however, that he believed the buildings and premises were owned by the Massachusetts corporation because he had been employed to put the mill in condition, receiving the orders from Gardner, the manager; because the mills were in operation, and making yarn, and bore a sign, "'Massachusetts Thread Company''; and because money was being spent by that corporation in improving the property. He testified that he was called up by the clerk from Boston, and sold the paint as a result of the message. No reversible error appears. The defendant had the benefit, through admitted testimony, of the material facts bearing on his intent and good faith. Testimony from him of statements of others was hearsay. What Gardner, Miss Carmody and the newspapers said was clearly hearsay.

The judge properly could exclude the grounds of belief, if he admitted the testimony that Bolusky believed to be true what he had stated to Williams. All that was offered except the newspaper articles was put in evidence in the course of the cross-examination. No good exception lies to the exclusion of testimony which, at a later point in the trial, is eventually admitted.

The defendants contend that there was error in refusing to find them not guilty. In addition to the evidence already stated there was evidence that Remick, McIntyre

and Levine were officers of the Massachusetts corporation; that Bolusky at the time of his conversation with Williams on November 26, 1929, at the Boston office of that corporation took a sheet from a pad used in its business and on it Williams filled in the order given for the lead and oil. That order signed by Bolusky purported to be an order from the Massachusetts Thread Mills, Inc., for three hundred sixty one-hundred pound kegs of white lead, and thirty-two barrels of linseed oil at $11.31 per one hundred pounds for the white lead and fifteen and two tenths cents per pound for the oil, to be shipped December 31, 1929, via Fall River Line to Massachusetts Thread Mills, Inc., at Fall River "freight allowed" net cash. The date for delivery was subsequently changed, ostensibly to enable use by December 3. There was also evidence that a sale on such an order was a sale for cash on delivery at Fall River, on which title would pass to the buyer on delivery to the carrier. A director in the Massachusetts Thread Mills, Inc., Gifford, testified that Levine was its treasurer, that in late December, 1929, or early January, 1930, he spoke with Levine about this lead and oil and was told, "Well, that is all right. It will be paid for when it comes" or something like that, "not to worry, the matter would be fixed up." He gave testimony also that a contemplated purchase of the land and buildings had never been carried out.

The defendants' contention that no larceny by false pretences had been made out rests on the assumption that there had been a *bona fide* sale to the Massachusetts Thread Mills, Inc., by the National Lead Company resulting either in passing of title to the former or a retention of title by the latter until payment. They argue that, wherever the title stood as between the corporations, these defendants had no title, and so, as matter of law, could not be guilty of obtaining property by false pretence. If the title was in either the defendants' crime, if any, was stealing at common law from the holder of the title.

We need not discuss the subtilties of the argument, because, on the evidence, the judge warrantably could disbelieve the testimony of Bolusky and McIntyre, and find

that there was no *bona fide* purchase by the Massachusetts Thread Mills, Inc., although the lead company intended to pass title. The Commonwealth claimed that there was a fictitious semblance of such a purchase; that in fact Bolusky and Levine, in conspiracy to obtain the goods, were themselves the purchasers under the guise of the corporation and got a title on receiving the goods at Fall River as on a cash sale. If they were the real purchasers, they got a title and had obtained property by false representation in regard to the corporation and its actions. If the National Lead Company intended to part with its title, the offence was obtaining property by false pretence. *Commonwealth* v. *Barry*, 124 Mass. 325, 327. *Commonwealth* v. *Jeffries*, 7 Allen, 548. *Commonwealth* v. *Devlin*, 141 Mass. 423.

The defendants' contention that the statements about the corporation were, at most, only false representations with regard to the credit of the Massachusetts Thread Mills, Inc., and so, under G. L. c. 266, § 35, since they were not in writing, do not support an indictment, is not sound. That statute furnishes no protection to one who makes false statements as to the character, credit and ability of another in order that the speaker may obtain something for himself through reliance placed upon the misrepresentations. *Walker* v. *Russell*, 186 Mass. 69. *Commonwealth* v. *Quinn*, 222 Mass. 504, 515. It applies where the object is to secure something for that other from the person to whom the representation is made. Here it could be found that no advantage for the Massachusetts Thread Mills, Inc., was sought. False statements with regard to its financial ability could be found to be parts of false pretences designed to defraud for the advantage solely of the defendants in obtaining property for themselves. By its express language the statute applies to "a false pretence relative to the purchaser's means or ability to pay." The Massachusetts Thread Mills, Inc., it could be found, was not the purchaser. Neither on the ground that no obtaining by false pretence appeared nor that such false pretences as were made were sheltered by G. L. c. 266, § 35, was a finding of not guilty required as matter of law.

The evidence with regard to Bolusky's actions would justify a finding of his guilt on the indictment for larceny. An attempt to defraud, an actual fraud, false pretences for the purpose of perpetrating that fraud, its accomplishment by means of those false pretences, the essentials to guilt, see *Commonwealth* v. *Burton*, 183 Mass. 461, 467, could be found as against him. *Commonwealth* v. *Steinberg*, 265 Mass. 45. *Commonwealth* v. *Jeffries*, 7 Allen, 548, is in point and controlling.

With regard to Levine the evidence is largely inferential. Nevertheless it could properly be found upon the evidence with legitimate inferences from facts which could be found to exist that, although it had another bank account, funds of the Massachusetts Thread Mills, Inc. were held by him intermingled with his own moneys, that all that was received from the several sales of the lead and oil came into his hands, that he furnished the money for payment of the freight, the essential and preliminary step in obtaining control of the goods. Standards of his handwriting were put in evidence. The invoices from the National Lead Company, bills for the goods sold to purchasers, checks in payment from purchasers, were entered on the books of the Massachusetts Thread Mills, Inc. where Levine, as treasurer, could know of them. His statements as given by the witness Gifford could be found to show a knowledge of the transactions, and his advice to Gifford not to worry was equivocal. While close, we think the evidence will sustain a finding of guilt. *Commonwealth* v. *Langley*, 169 Mass. 89. We assume that the statement in the record, that "the following stipulation was made" that certain writings on the checks received from purchasers were in the hand of McIntyre, means that the Commonwealth joined in so agreeing and thereby was precluded from claiming the writing, in fact, to be that of Levine. If this assumption be untrue, it was permissible for the judge to find from comparison with standards of Levine's writing, that Levine indorsed these checks himself and thereby carried the amounts into his personal account. In view of our assumption, we consider such a finding unwarranted and give it no weight.

Upon the indictment for conspiracy to steal, collusion between Bolusky and the treasurer of the Massachusetts Thread Mills, Inc., may be inferred from the conduct shown. No error is shown in the refusals to find not guilty.

What has been said in discussing the other exceptions renders discussion of the refusals to instruct and of the instructions given, in detail, unnecessary. Several of them though in form requests for rulings of law are, in truth, requests for findings of fact. Certain were given with modifications which we find to be proper, limiting the rulings to the facts of these cases. Others rest upon assumptions of fact with regard to a contract by the Massachusetts Thread Mills, Inc., which, as we have stated, could be found not to exist. We have examined them and find no error.

It follows that the order must be

*Exceptions overruled.*