COMMONWEALTH vs. ROBERT J. BJORKMAN.

Suffolk.    September 19, 1973. — November 14, 1973.

Present:    TAURO, C.J., REARDON, QUIRICO, BRAUCHER,
& HENNESSEY, JJ.

*Evidence,* Similarity of condition; Judicial discretion; Competency;
Relevance and materiality; Photograph; Opinion: expert; Presumptions
and burden of proof. *Error,* Whether error harmful. *Practice,*
*Criminal,* Charge to jury.

At a trial for murder by strangulation, there was no error in the admis-
sion of a cloth found around the neck of the victim at an autopsy
held several months after his death even though there was no prelimi-
nary finding of similarity or difference between the condition of the
cloth at the time of death and time of the autopsy. [300-301]
There was no error at a murder trial in the admission of the findings of the
medical examiner as to the results of an autopsy of the victim held sev-
eral months after his death and as to the cause of death, even absent a
preliminary finding of similarity of conditions of the body at both
times, where, although the body was "very badly decomposed" at the
time of the autopsy, the medical examiner was able to form opinions
within the realm of reasonable medical certainty as to the cause of
death. [301-302]
At a trial for murder by strangulation, there was no abuse of discretion in
the admission of photographs showing the body of the victim at the time
of an autopsy held several months after his death and showing a cloth
found around his neck. [302-303]
On the record of a trial for murder by strangulation, there was no error in
the admission in evidence of shirts of the victim to prove the size of his
neck in relation to the length of a cloth found tied around his neck.
[303-306]
The exclusion of a proper question on cross-examination of a witness for
the Commonwealth at a criminal trial was not prejudicial in view of
subsequently admitted testimony of the witness as to the subject matter
of the excluded question. [306-307]
Instructions to the jury at a murder trial defining "reasonable doubt"
were not error as shifting the Commonwealth's burden of proof to the
defendant in that such instructions included, with other definitions, the
phrase "a doubt based upon a reason." [307-309]

INDICTMENT found and returned in the Superior Court on
February 10, 1971.

The case was tried before *Roy,* J.

*William P. Homans, Jr.,* for the defendant.

*Alan Chapman,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J.  The defendant was indicted for murder in the first degree, found guilty by a jury of murder in the second degree, and sentenced to the Massachusetts Correctional Institution at Walpole for the term of his natural life. The defendant appeals pursuant to G. L. c. 278, §§ 33A-33G, and argues fourteen of thirty-eight assignments of error.

The pertinent evidence is summarized. On May 28, 1970, the partly clothed body of one Ernest M. Hunt was discovered in his Boston apartment by the landlord. In response to the landlord's call three Boston policemen and a police physician came to the apartment and viewed the body. The landlord, two of the policemen and the police physician testified that there was a "repugnant odor" in the apartment, that there were blisters visible on the victim's body (which was lying on its side), and that there was a white cloth wrapped around his neck. After a cursory external examination the police physician declared the victim to be dead and ordered the body removed to the Southern Mortuary. Dr. George W. Curtis, Suffolk County medical examiner, rejected the body for an autopsy on the basis of a written report from the mortuary. G. L. c. 38, § 6. *Gahn* v. *Leary,* 318 Mass. 425 (1945). Dr. Oliver Redden, a doctor assigned by the Department of Public Health, thereupon observed the body and signed a death certificate in which he stated the cause of death to be myocardial infarction.[1]  At the direction of the victim's brother, a private undertaker embalmed and buried the body. The undertaker testified that he observed a white cloth around the victim's neck.

Some time later, Dr. Curtis received information from the Boston police which caused him to order the exhumation of

---

[1]Neither Dr. Redden nor any of the others who had previously viewed the body observed any knots in the cloth (probably because of their position at the back of the neck). Nor was any physical examination made of the body itself. No history of heart condition was obtained.

the victim's body for the performance of an autopsy. The body was exhumed on November 13, 1970, and Dr. Curtis performed the autopsy on December 10, 1970. As a result of his findings from that autopsy Dr. Curtis concluded that the victim had not died of heart disease but instead was a victim of "strangulation by ligature, homicide."

The defendant was linked to the death of the victim principally by the testimony of two men, Alan Coyne and Thomas J. Hutton. Coyne and Hutton both testified that they had shared an apartment in Somerville with the defendant for a period of time in May, 1970. The three men talked of going to California together, but the defendant had said that he did not have enough money to make the trip. On the evening of May 26, 1970, the defendant left the other two, saying that he was going to obtain the necessary funds for the trip. Coyne and Hutton did not see the defendant again that evening, but the next morning they found him asleep on the living room couch. They also found cash, credit cards, keys, a wallet and a television set which had not been there the night before. After being pressed for an explanation of the presence of these articles, the defendant stated that he had robbed and killed a man for them. He pointed out to Coyne and Hutton a car parked outside which he also claimed to have stolen from the same man. Later that morning the defendant repeated that he had killed a man, adding that he had strangled him from behind. Hutton alone testified to a separate conversation in which the defendant related the circumstances of the murder. According to Hutton, the defendant said that he had met the victim in a bar, that they went together to the victim's apartment where the defendant agreed to engage in homosexual activity with the victim in exchange for $20, that the victim thereafter fell asleep, and that the defendant, upon looking for the $20 and finding only $9.40, became enraged and strangled him while he slept.

Hutton and Coyne further testified that during that same morning they and the defendant drove to the defendant's mother's house in Framingham. Although there is some conflict in the testimony as to precisely what transpired during

this visit, it appears that the defendant's mother gave a sum of money in exchange for the television set.[2] Subsequently, Coyne and Hutton separated from the defendant and returned to the Somerville apartment where Hutton took possession of the credit cards which the defendant had left behind. Hutton and Coyne, without the defendant, drove to California, where they eventually parted company. Hutton was later arrested in Wyoming as a result of having used one of the credit cards to purchase a tire. One of the credit cards which was found in Hutton's possession at the time of his arrest was in the name of the victim. Two credit cards of the victim were identified at the trial by the victim's brother.

The defendant's arguments on this appeal mostly concern the admission of items of evidence relating to the cause of the victim's death. We deal with those arguments seriatim.

1. Dr. Curtis, the medical examiner, gave detailed testimony describing the results of the autopsy which he performed on the body of the victim. He also gave his opinion as to the cause of death, based in part on the autopsy results. During the doctor's testimony the assistant district attorney introduced in evidence two photographs of the body taken by Dr. Curtis at the time of the autopsy. He also introduced the white cloth which Dr. Curtis had removed from the victim's neck. Dr. Curtis was permitted to display to the jury the knots which he had found in the cloth.

The defendant assigns as error the admission in evidence of these several items of real and oral evidence on the ground that there had been no preliminary showing that the condition of the body and the condition of the white cloth at the time of the autopsy were similar to their conditions at the time of death. Because of the time lag of from six to seven months between the date of death and the autopsy, the defendant deems inadmissible all evidence which described or was based upon the conditions of the body and of the cloth on the latter date. We reject this contention.

[2]Coyne identified a television set present in the court room as the one which had been sold to the defendant's mother. Two other witnesses identified the same television set as similar to one which they had seen in the victim's apartment.

Five of the six witnesses who had viewed the body after its discovery but prior to its interment testified that they had seen a white cloth around the neck. Dr. Curtis testified that he found a white cloth around the neck when he photographed the body prior to beginning the autopsy. One of the policemen who observed the body on the day it was discovered and the undertaker who embalmed it both testified, in substance, that the photographs taken at the autopsy fairly represented the cloth which they had originally observed on the victim's neck. Dr. Curtis also testified that he removed the cloth from the neck and stored it in his morgue until removing it just prior to the trial. When the cloth was introduced Dr. Curtis identified it as the one he removed from the victim's neck and as the one appearing in the photographs. This provided ample uncontradicted evidence from which the jury could identify the white cloth and could determine the similarity or differences between its condition at trial and its condition at the time the victim's body was discovered. There was no necessity for the judge to make a preliminary finding of similarity. See *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 496 (1966). Indeed, in the circumstances, it might have been erroneous for him to have done so, since this was a question for jury determination. *Id.*

We reach the same conclusion on the defendant's argument that Dr. Curtis's description of the autopsy results and the doctor's opinion as to the cause of death should also have been excluded absent a preliminary finding of similarity of conditions. Dr. Curtis's testimony as to the condition of the body at the time of autopsy was both extensive and detailed. He found the body to be "very badly decomposed," and in explaining the autopsy procedure he described the extent of decomposition present in specific organs. Nevertheless, he was able to form opinions "within the realm of reasonable medical certainty" that the cause of death was neither "arteriosclerotic heart disease" nor "coronary occlusion" but rather was "asphyxia due to strangulation by ligature, homicide." It was for the jury to determine the cause of death. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 463

(1942). *Commonwealth* v. *Noxon,* 319 Mass. 495, 534 (1946). The lapse of time between death and the autopsy went to the weight to be given Dr. Curtis's opinions, and not to their admissibility. Cf. *Commonwealth* v. *Giacomazza, supra,* at 471. The defendant's contention in essence is a challenge to the relevance of data obtained from the autopsy performed several months after death. Implicit in the trial judge's overruling of defence counsel's objections to the doctor's testimony is the judge's determination that there was evidence from which the jury could infer that the body as described by Dr. Curtis was sufficiently similar to the body at the time of death to provide relevant information for their consideration. That is all that was required of the judge. We conclude that the evidence was admissible. See *Commonwealth* v. *Boudreau,* 362 Mass. 378-381 (1972), and cases cited. It was not necessary for the trial judge explicitly to state his conclusion as to relevancy as a preliminary finding, since that conclusion was implicit in his ruling that the evidence was admissible. *Commonwealth* v. *Tucker,* 189 Mass. 457, 476 (1905).

Finally, the defendant's argument that it was error to admit the two photographs of the body relies on the holdings of *Lynch* v. *Larivee Lumber Co.* 223 Mass. 335 (1916), and *Everson* v. *Casualty Co. of Am.* 208 Mass. 214 (1911), that photographs may be admitted only after a determination by the judge as to "whether there is sufficient similarity between what is offered and the original which is the subject of inquiry to make it of any assistance to the jury in passing upon the issue before them." 208 Mass. at 219. It is also the rule that the admissibility of photographs is largely a discretionary question for the trial judge, and "his action will not be revised unless it appears to have been plainly wrong." *Id.* The photographs were admitted during Dr. Curtis's testimony and were expressly identified by him as representing the condition of the body on the date of the autopsy, not on the date of death. Two witnesses testified that the photographs fairly represented the white cloth on the victim's neck as they had observed it on the day the body was discov-

ered. The photographs were a representation of a part of the history of the condition of the body and of the cloth from the time of death to the time of the trial, and may have been of assistance to the jury in the consideration of questions relating to the condition of the body and to the substance and fabric of the cloth, and of the possibility of changes therein, as well as for the purpose of comparing the photograph with the cloth as the jury saw it. *Commonwealth* v. *Tucker,* 189 Mass. 457, 476 (1905). It was not error to permit the jury to examine the photographs. See *Commonwealth* v. *Woods,* 339 Mass. 7, 10 (1959); *Commonwealth* v. *Murphy,* 356 Mass. 604, 608-609 (1970).

2. The defendant has made serious challenge to the admission in evidence of two shirts which were identified as having belonged to the victim. The shirts, apparently with the numeral "15" on the collar of each, were offered in support of testimony by the victim's brother that his brother's "neck size" was "fifteen." Although the victim's brother was not permitted to read aloud the numerals on the shirt collars, the shirts were available to the jury who thus could read those numerals for themselves. The defendant asserts that since the only purpose for which the shirts could have been offered was to prove the size of the victim's neck, their admission was erroneous for two reasons: the numerals on the shirt collars were hearsay, and, in any case, evidence of shirt collar size is irrelevant to the issue of neck size.

The admissibility of the shirts is a significant issue only in so far as it bears on the defendant's assignment of error (argued separately) concerning the admission of a hypothetical question which was based in part on an assumption as to the circumference of the victim's neck. In response to that question Dr. Curtis testified that in his opinion the white cloth found on the victim's neck, the circumference of which he was told to assume was fifteen inches, would have been an "adequate producing cause" of death by strangulation.[3]

_____

[3]The entire question and Dr. Curtis's answer to it were (omitting defence counsel's interposed objections): COUNSEL FOR THE COMMONWEALTH: "And, now, Doctor, assuming, if you will, Mr. Hunt's neck had a circumference of about — assuming, if

Commonwealth *v*. Bjorkman.

Defence counsel objected to the question on the basis that there had been no evidence of neck size, but was overruled when the assistant district attorney promised to produce such evidence subsequently. In short, the defendant contends that the shirts and the numerals thereon were inadmissible (for the reasons stated), that there was therefore no competent evidence as to the size of the victim's neck, and, therefore, that the hypothetical question addressed to Dr. Curtis and his response thereto must be struck as based on assumed facts not supported by the evidence (see *Miller* v. *Boston & Maine R.R.* 240 Mass. 461, 464 [1922]). We reject this argument as one based on incorrect premises.

In the first place, we believe that the shirts themselves were admissible. Putting to one side the question of the admissibility as evidence of the numerals on the collars, we think that the physical size of the collars of the victim's shirts was relevant evidence of the size of his neck. It was for this purpose that the trial judge permitted their admission in evidence. It seems to us reasonable to assume that, as a general rule, a man's shirt collar would correspond in length to the circumference of his neck. It is true, of course, that proof of shirt collar size is at best circumstantial evidence of neck size. In this case, however, direct evidence of what the circumference of the victim's neck had been during his lifetime was unobtainable. The body was already swollen when first discovered, and it was swollen and decomposed at the time of the autopsy. In that situation it was proper for the trial judge to permit the jury physically to examine the victim's shirts as evidence of his neck size. "It is quite the common practice" to admit the personal effects, including clothing, of the victim of a crime. *Commonwealth* v. *Simpson,* 300 Mass. 45, 57 (1938). The defendant's objection to the admission of the

you will, Doctor, that Mr. Hunt, prior to his death had a circumference of fifteen inches and assuming further, Doctor, those things that you have testified to, namely, that you found wrapped around his neck a ligature or a cloth double-knotted in the back, and assume further, Doctor, that you removed that cloth and that you measured it from end to end and found it to be thirteen and a half inches. Do you have an opinion, Doctor, as to whether or not the circumference of that cloth or the area of that cloth as placed around the neck of . . . Hunt would be an adequate producing cause of his death by means of strangulation?" THE WITNESS: "It is my opinion, yes, that this is adequate to cause asphyxia and death."

shirts was properly overruled.[4]

Second, the defendant's argument ignores the testimony of the victim's brother referred to above that he knew "of . . . [his] own personal knowledge" that his brother's "neck size" was fifteen. Defence counsel did not object to this testimony, although on cross-examination he did elicit testimony from him to the effect that he had never measured his brother's neck but had gained his "knowledge" of the neck size largely from observing his brother's shirts. In any case, testimony of the victim's brother provided some additional evidence from which the jury could have inferred that the victim's neck was fifteen inches in circumference. This was sufficient to support the factual assumption underlying the challenged hypothetical question. *Mealey* v. *Super Curline Hair Wave Corp.* 342 Mass. 303, 306 (1961).

Finally, even if we were to accept the argument that there was no competent evidence showing that the victim had a neck fifteen inches in circumference, we would not reverse. The assistant district attorney asked Dr. Curtis to assume that the victim "prior to his death, had a circumference of fifteen inches," when he, of course, meant to refer to the circumference of the victim's neck. As was said in *McLaughlin* v. *Bernstein,* 356 Mass. 219, 224 (1969): "The infirmities, if any, of the [expert's] testimony affected its weight rather than its admissibility." In addition, the actual cause of death of the victim was, as we have said, for the jury to determine. The evidence before them on that issue was extensive. There was testimony from several witnesses who observed the white cloth around the victim's neck. Dr. Curtis testified that, in his opinion, the cause of death was strangulation by ligature. He gave detailed testimony that he found the white cloth tightly wrapped around the victim's neck and double knotted in the back, and that he found a depressed band on the skin of the neck underneath the cloth. Two photographs of the body, with the cloth on the neck clearly visible, were intro-

---

[4]In addition, it would seem to us a matter of common practice that the purchases of articles of clothing such as shoes, hats and shirts are preceded by a designation of the size by the purchaser.

Commonwealth *v.* Bjorkman.

duced in evidence. The cloth itself was introduced and available to the jury in addition to the two shirts. Also, Dr. Curtis was permitted to read in evidence, without objection or limitation, a portion of his testimony before the grand jury in which he stated: "I feel it [i.e., the white cloth] is definitely a ligature applied by someone with knots in the back. Death was due to manual strangulation by ligature, homicide." Clearly there was sufficient evidence from which the jury could ascertain for themselves the relationship between the size of the victim's neck and the length of the white cloth, regardless of the precise measurement in inches of the neck. In the closing charge the judge properly instructed the jury that they must disregard the opinion of any expert unless they found that each assumed fact on which such opinion was based was true beyond a reasonable doubt. *Commonwealth* v. *Taylor,* 327 Mass. 641, 649 (1951), and cases cited.

3. The defendant next contends that there was error in the exclusion of a hypothetical question put by his counsel during cross-examination of Dr. Curtis concerning the cause of the "groove" that Dr. Curtis had found on the skin of the victim's neck after he had removed the white cloth. The excluded question concerned the possibility that the mark on the neck might have been caused by swelling of the body as a result of post-mortem decomposition.[5] The doctor had already testified that in his opinion the cause of death was strangulation by ligature, apparently basing that opinion at least in part on the presence of the groove in the victim's neck under the white cloth. Defence counsel merely wanted to explore the possibility that the groove in the skin might have resulted from a cause other than strangulation by ligature. The judge excluded the question "on the basis that you are now posing possibilities to the doctor."[6] The defendant

[5]The precise question was: "And it's by no means an impossibility, is it, sir, for the swelling under a neckband, or for that matter, under a shirt, as the result of decomposition, to produce a mark in the neck?"

[6]The judge had previously excluded a similar hypothetical question, stating that he would "not permit any opinions as to possibilities." No exception was taken to this ruling.

Commonwealth v. Bjorkman.

now argues that this ruling impermissibly restricted his cross-examination of Dr. Curtis as to an issue central to the case.

We believe that the defendant in his cross-examination was pursuing a proper line of inquiry. We need not decide, however, whether the question in its precise form, should have been allowed.[7] There was no prejudice to the defendant in its exclusion because in response to subsequent questioning Dr. Curtis was permitted to testify as to his opinion concerning the possibility that the groove was caused by swelling rather than by strangulation. Dr. Curtis answered questions both as to whether his opinion that strangulation was the cause of death excluded the possibility that post-mortem swelling was the cause of the groove, and as to whether, in general, a tight band on the neck plus post-mortem swelling could produce such a groove. Nothing more would have been added by an answer to the excluded question. As we said in *Commonwealth* v. *Levine,* 280 Mass. 83, 92 (1932): "No good exception lies to the exclusion of testimony which, at a later point in the trial, is eventually admitted."

4. The final argument of any substance advanced by the defendant concerns the judge's instruction to the jury defining "reasonable doubt." The most relevant portion of the charge dealing with reasonable doubt is set out in the margin.[8] The defendant contends that the phrase "[a] doubt

[7]As to the discretion of the trial judge to admit or exclude hypothetical questions, see *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 280 (1962), and cases cited.

[8]"Now it is the obligation of the Commonwealth to establish the guilt of a defendant beyond a reasonable doubt. That principle of law is not really difficult to understand nor to apply to a criminal case.

"It is not the obligation of the Commonwealth to establish the guilt of the defendant beyond all possible doubt. That would be an insuperable, unsufferable burden upon the Commonwealth. The law does not require the Commonwealth to establish the certainty that you would get in mathematics or any of the exact sciences. It is simply proof beyond a reasonable doubt, not beyond all doubt.

"Reasonable doubt in the law means exactly what it means in common, everyday, ordinary usage of those two words: A doubt based upon a reason, a doubt which resides in the mind of a reasonable man who is earnestly seeking the truth. It is not a foolish doubt. It is not a fanciful doubt. It is not a doubt in the mind of a juror who is simply seeking an excuse to acquit a defendant. It is the sort of a doubt which would make you pause or hesitate in making a decision in the graver and more important aspects of your life.

"If there is such a reasonable doubt in your minds as to the guilt of this defend-

based upon a reason'' might have had the effect of shifting the Commonwealth's burden of proof to the defendant in that it required the jury to search for ''a reason'' to acquit rather than concentrate on the sufficiency of the evidence to convict. To support this argument, the defendant cites several cases involving jury instructions which also appeared to require ''a reason'' for a reasonable doubt. In each of the cases cited the appellate court expressed disapproval of such definitions of the reasonable doubt standard, see, e.g., *United States* v. *Harris,* 346 F. 2d 182, 184 (4th Cir. 1965); *United States* v. *MacDonald,* 455 F. 2d 1259, 1262-1263 (1st Cir. 1972),[9] but in only one case cited did the court hold such language to be reversible error. *Pettine* v. *Territory of N. M.* 201 Fed. 489 (8th Cir. 1912). The court in the *Pettine* decision held that an instruction defining reasonable doubt as ''one for which a reason could be given based on the evidence or want of evidence in the case'' (at 495) reversed the burden of proof by requiring *the defendant to give a reason* for his acquittal (at 496). We believe that the challenged instruction in the present case could not have had any such prejudicial effect as to require reversal.

We have often repeated that the propriety of jury instructions must be determined from a consideration of the charge in its entirety, not from viewing ''fragmentary instructions out of context.'' *Commonwealth* v. *Pettie,* 363 Mass. 836, 843 (1973), and cases cited. In the present case the judge clearly stated that it was ''the obligation of the Commonwealth to establish the guilt of a defendant beyond a reasonable doubt.'' The remainder of the charge, except for the challenged phrase, was in language substantially similar to

ant, he is entitled to it. He is entitled to be acquitted. However, if no such reasonable doubt — with the emphasis upon the 'reasonable' — exists in your minds, then it is your sworn duty to find the defendant guilty.''

[9]In *United States* v. *MacDonald, supra,* the court, in discussing the instruction ''a doubt for which you can give a reason,'' said, with an admonition that such words should not be used in the future in the First Circuit: ''Individual jurors were not charged with either articulating a supportable *ratio decidendi* or capitulating to the will of opposing jurors, but instead were cautioned in terms, which were perhaps unwisely emphatic, that a reasonable doubt was more than an irrational hesitancy to convict based on pure conjecture.''

that which has previously been approved by us. *Commonwealth* v. *Madeiros,* 255 Mass. 304, 307-308 (1926). *Commonwealth* v. *Libby,* 358 Mass. 617, 621 (1971). Viewed in this context, the phrase "[a] doubt based upon a reason," even if of doubtful propriety standing alone, could not have caused any prejudicial shifting of the Commonwealth's burden of proof in the minds of the jurors. See *Commonwealth* v. *Bumpus,* 362 Mass. 672, 682 (1972), in which we found no error in an instruction that a reasonable doubt "has to be a doubt in your mind that you can stand up in the jury room and argue with principle and integrity to your fellow jurors." See also *Commonwealth* v. *Gerald,* 356 Mass. 386, 390 (1969).

5. We have considered, but find no need to discuss, the one other assignment of error which the defendant has argued. In addition, we have complied with the requirements of G. L. c. 278, § 33E, by reviewing the entire trial transcript and record, and we have found no reason either to order a new trial or to direct a verdict of a lesser degree of guilt.

*Judgment affirmed.*