COMMONWEALTH *vs.* JOSEPH C. CRAWFORD.

Suffolk.  November 6, 1981. — December 14, 1981.

Present: HALE, C.J., GRANT, & GREANEY, JJ.

*Evidence*, Photograph.  *Practice, Criminal*, Conduct by prosecutor, In-
structions to jury.  *Constitutional Law*, Right to obtain testimony.

At a criminal trial no error appeared in the admission in evidence of mug
shot type photographs of the defendant, where the front and profile
views had been severed and the photographs had been sanitized out of
the presence of the jury.  [778]
At a criminal trial where two alleged coparticipants in the crimes with
which the defendant was charged had appeared to testify as witnesses
for the defense, the prosecutor's warnings to these prospective witness-
es in language referring to the "dictates of [his] oath of office" and to
the witnesses' possibly "placing themselves [in jeopardy]," together
with his silence respecting a minatory announcement by the judge as
to prosecution of the witnesses for "additional crimes" did not, in the
circumstances, occasion the loss of any helpful testimony from either
witness so as to deprive the defendant of the rights guaranteed him by
the Sixth Amendment to the Federal Constitution or art. 12 of the
Massachusetts Declaration of Rights.  [779-784]
At a criminal trial, unobjected-to language in the judge's instructions to
the jury, describing a reasonable doubt as "a doubt for which a good
reason can be given" did not, when considered in light of the evidence
and the charge as a whole, present a substantial risk of a miscarriage of
justice.  [784-785]

INDICTMENTS found and returned in the Superior Court
on September 16, 1977.

The cases were tried before *Byron*, J.

*Hans R. Hailey* for the defendant.

*Leonard J. Henson*, Assistant District Attorney (*Peter
Grabler*, Legal Assistant to the District Attorney, with him)
for the Commonwealth.

GRANT, J.  On the morning of June 23, 1977, either two
or three young men attempted to commit a robbery from

the driver of a newspaper delivery van which was parked in a bus stop in the Roxbury district of Boston. The driver (victim) resisted the attempt, was stabbed once and shot twice, but managed to shoot two men before he collapsed and was taken to Boston City Hospital. The defendant Crawford (defendant), Hubert Smith and Larry Talbert were separately indicted for armed assault with intent to murder, for armed assault with intent to rob, and for assault and battery by means of dangerous weapons (a knife and a handgun). Smith and Talbert, both of whom had been shot by the victim, pleaded guilty to the indictments against them and were sentenced. A jury convicted the defendant on all the indictments against him, and he has appealed.

The victim made photographic identifications of all three men shortly after he regained consciousness following surgery at the Boston City Hospital. He repeated those identifications several days later, following his transfer to a different hospital. He testified at trial that the defendant entered the van through the open doorway on its right-hand side and stabbed him just below his right breast; that as he was struggling with the defendant, Talbert started to enter the van with a gun in his hand; that Talbert shot him and he shot Talbert; that as he struggled to get out through the doorway, the defendant shot him with a pellet gun; that after he did get through the doorway, he observed Smith standing on the adjacent sidewalk with a knife in his hand; that he immediately shot Smith; and that he then collapsed behind the van as he attempted to pursue one of his fleeing assailants.

The victim identified a hat and a pair of sunglasses which he said had been worn by the defendant and which were later found on the sidewalk next to the van; he also identified a knife which he said was the one used to stab him and which was also found on the sidewalk. A police criminalist testified to finding bloodstains on the hat, glasses and knife. The letter "J" is inscribed on the wooden handle of the knife (which we have examined) and is clearly visible to the naked

eye; the criminalist testified that the letters "C", "W" and "F" also show up under oblique lighting.[1]

1. The prosecutor advised the judge at the bench that he intended to offer the mug shots of the defendant, Smith and Talbert which the victim had picked out of the array shown him by the police in the course of the two photographic identifications. The only objections were that the mug shots had not been sanitized and "are incapable of being sanitized."[2] The prosecutor severed the front from the profile or angular views (see *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 309 [1979]; *Commonwealth* v. *Lockley*, 381 Mass. 156, 165-166 [1980]; *Commonwealth* v. *Blaney, ante* 730, 733-735 [1981]) and sanitized them out of the presence of the jury (see *Commonwealth* v. *Cobb*, 374 Mass. 514, 523 [1978]). The defendant did not request any cautionary or limiting instruction. See *Commonwealth* v. *McCants*, 3 Mass. App. Ct. 596, 598 (1975); *Commonwealth* v. *Manigault*, 6 Mass. App. Ct. 543, 547 (1978); *Commonwealth* v. *Soule*, 6 Mass. App. Ct. 973, 974 (1979). By the time the jury saw the six photographs (we have examined them) there was nothing on the face of any of them to indicate why or when any of them had been taken or how any of them had come into the possession of the police. The reverse of the angular view of the defendant bore an address in Roxbury and the legend "Brn eyes Blk hair." Counsel for the defendant had previously advised all the veniremen of the defendant's address, and the jury were reminded of it during the course of the alibi evidence offered by the defendant. The quoted legend suggested nothing which the jurors could not deduce for themselves by the simple expedient of viewing a black and white photograph of a black man.

---

[1] As the caption indicates, the defendant's name is *Joseph Crawford*.

[2] In particular, there was no objection to the jury's seeing the profile or angular views. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 659 and 660 n.24 (1980); *Commonwealth* v. *McCants*, 3 Mass. App. Ct. 596, 597 (1975).

2. Based on the preliminary reports received by him, including reports of the statements of two eyewitnesses who later testified for the prosecution at trial, the investigating officer originally believed that Smith and Talbert were the only participants in the incident in question. It was only as the result of an anonymous tip and his knowledge of Smith's and Talbert's usual companions that the officer included the mug shots of the defendant in the array which he exhibited to the victim. The defense was that Smith and Talbert had been the only participants, that the defendant had been elsewhere and that the victim had been mistaken in believing there were three participants and in identifying the defendant as the third. To that end trial counsel for the defendant advised the jury in his opening statement that he intended to call Smith and Talbert as witnesses for the defense.[3]

There was some question as to the willingness of Smith and Talbert to testify, and the judge decided to follow the "commendable practice" of bringing the prospective witnesses in on voir dire, giving them general advice as to the privilege against self-incrimination and the attendant risks of prosecution, and appointing counsel to give them specific advice in the circumstances. See *Commonwealth* v. *Slaney*, 345 Mass. 135, 141-142 (1962); *Taylor* v. *Commonwealth*, 369 Mass. 183, 192 (1975); *Commonwealth* v. *Carballo*, 9 Mass. App. Ct. 57, 59, *S.C.*, 381 Mass. 227 (1980). See also *Robinson* v. *Zelker*, 468 F.2d 159, 162 n.5 (2d Cir. 1972), cert. denied, 411 U.S. 939 (1973); *State* v. *Brown*, 321 A.2d 478, 481, 483 (Me. 1974). Contrast *Webb* v. *Texas*, 409 U.S. 95, 97-98 (1972). Smith was brought in first; the judge gave him the usual general advice and specifically mentioned the possibilities that he might be prosecuted for perjury or for conspiracy as a result of something he might say.[4] Talbert was brought in next, and he was given the same

---

[3] The defendant is represented by different counsel on appeal.

[4] The judge's suggestion of the possibility of a prosecution for conspiracy seems more theoretical than real. It is common knowledge that ever since

general advice, but the judge did not mention any specific offence for which he might be prosecuted.[5]  The judge then appointed separate counsel to advise and represent Smith and Talbert.  Counsel appointed to represent Smith is an able, experienced practitioner in the field of criminal law; he knew that Smith was then serving a life sentence for first degree murder and that, as a practical matter, Smith had nothing to lose by perjuring or incriminating himself. Counsel appointed for Talbert was relatively inexperienced; the record is obscure as to the extent of Talbert's prior involvement with the law, apart from the three indictments against him which have already been mentioned. Later the same day, both counsel advised the judge that their respective clients were willing to testify.

The following morning, in the presence of counsel for the defendant but prior to the arrival of counsel for the witnesses, the prosecutor advised the judge of his desire to have it appear on the record that "both of these prospective witnesses understand clearly and unequivocally the jeopardy in which they *may* be placing themselves, and further . . . a waiver of any rights against self-incrimination" (emphasis supplied).  The judge stated his understanding of the rights of the witnesses in the circumstances and instructed the prosecutor to relay that understanding to counsel for the witnesses.  The prosecutor said, "I indicated to [counsel for the witnesses] . . . when they returned and expressed that their clients had a willingness to testify that I was incredulous as to their position as defense counsel with respect to .

---

the advent of G. L. c. 278, § 2A, inserted by St. 1968, c. 721, § 2 (see now Mass.R.Crim.P. 9[e], 378 Mass. 861 [1979]), most prosecutors have not bothered to seek indictments for conspiracy whenever they have believed the evidence would support convictions of substantive offences.  It is also common knowledge that prosecutors have generally not put the Commonwealth to the time and expense of additional prosecutions for conspiracy once they have secured convictions of substantive offences, as was the case with Smith and Talbert.

[5] As all the witnesses were sequestered, neither Smith nor Talbert heard the judge advise the other, although they may have talked with each other in the holding cells.

that. Whereupon, I inquired of [counsel for Talbert] how long he had been at the Bar, and he told me a little over a year." The prosecutor added that when he was told that the witnesses would testify, he had said to counsel for the defendant, in the presence of counsel for the witnesses, that "I would acquit myself according to the dictates of [my] oath of office as an assistant district attorney."[6]

Counsel for the witnesses arrived before the prosecutor could carry out the judge's instruction. The judge thereupon said to them: "Gentlemen, I've just been informed by the assistant district attorney that he wants it placed on the record that he *intends*, if there is incriminating evidence by either of these witnesses, *to* take appropriate steps and *prosecute* them for any additional crimes for which they have not been punished, or for which they have not been convicted, or otherwise, they have not pleaded guilty [emphasis supplied]. You were not in the room when he mentioned that . . . ." Counsel for Smith, apparently speaking for both witnesses, said, "We were aware of that, Judge." The judge said, "You have told us yesterday, each of you, that each wishes to testify." Counsel for Smith replied, "That's true, your Honor." The prosecutor said nothing further. Counsel for the defendant voiced no objection to anything said or done or not said or done by either the prosecutor or the judge.

Following a short recess, Smith took the stand and told the jury that he and Talbert had been the only participants in the assaults and that the defendant had been nowhere around. On cross examination, the witness gave what the jury could have found were evasive answers to questions by the prosecutor as to whether he and Talbert had been acting in concert or by prearrangement. Talbert then took the stand. The judge ruled that he was privileged to refuse to answer three successive questions as to whether he had com-

---

[6] Appellate counsel tells us in his brief that the prosecutor made this remark "in the presence of the witnesses," which is clearly not the case. We do not know whether counsel acted from mistake or contrary to S.J.C. Rule 3:08, DF 1, first sentence, 382 Mass. 803 (1981).

mitted the offences alleged in the indictments against him, and counsel for the defendant abandoned the witness without objecting to any of the judge's rulings.

Appellate counsel for the defendant urges that the actions of the prosecutor deprived him of Talbert's testimony and caused Smith to give such evasive answers on cross examination that the jury necessarily discredited all of Smith's direct testimony to the effect that the defendant had not participated in the assaults.[7] He cites several of the Disciplinary Rules (DR 7-102A[1], 7-104, 7-105 and 7-109) of the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law[8] and several of the Disciplinary Rules Applicable to Practice as a Prosecutor (PF 2, 3[b], 6 and 7[b])[9] and urges that the actions of the prosecutor were inherently unfair. The real question, never articulated by the defense or recognized by the prosecution, is whether the prosecutor wrongfully interfered with the defendant's right to secure the testimony of witnesses in his behalf which is guaranteed to every defendant by the Sixth Amendment to the United States

---

[7] The jury could easily have concluded that Smith's direct testimony was incredible, even without the benefit of his answers concerning whether he and Talbert had acted in concert or by prearrangement. He testified that he had entered the van and held a knife to the victim's throat, but he had to be prodded into saying that he had stabbed the victim; he could not say where he had stuck the knife into the victim; he said that he had borrowed the knife several years earlier from someone whose initials were the same as the defendant's (one Jacky Campbell), but, although he professed to be able to see the letter "C" inscribed on the handle of the knife, he offered no explanation for the ensuing letters "W" and "F" which the police criminalist said he had found. The jury were told that Smith was serving life for first degree murder and could draw their own inferences.

[8] The DR were promulgated effective October 2, 1972, 359 Mass. 796 (1972), were amended in respects not here material effective July 1, 1979, 378 Mass. 835 (1979), and now appear in S.J.C. Rule 3:07, 382 Mass. 768 (1981).

[9] The PF were promulgated effective March 1, 1979, 377 Mass. 922 (1979), and now appear in S.J.C. Rule 3:08, 382 Mass. 798 (1981). They are prefaced by the explanation: "The following rules are not published as criteria for the judicial evaluation, to determine the validity of a conviction, of the behavior of prosecutors . . . ."

Constitution and by art. 12 of the Massachusetts Declaration of Rights.

The prosecutor's remarks concerning the "dictates of [his] oath of office" and the possibility that the witnesses "[might] be placing themselves [in jeopardy]" were unnecessary but probably innocuous in all the circumstances. Compare *Commonwealth* v. *DiGiacomo*, 463 Pa. 449, 453-455 (1975). Contrast *Commonwealth* v. *Jennings*, 225 Pa. Super. Ct. 489, 490-493 (1973). The real difficulty arises from the prosecutor's silence (a) when the judge unwittingly translated those remarks into a minatory announcement that "the assistant district attorney . . . *intends . . . to . . . prosecute* for any additional crimes for which they have not been punished" and (b) when counsel for the witnesses responded, "We were aware of that, Judge." See *United States* v. *Smith*, 478 F.2d 976, 978-979 (D.C. Cir. 1973); *United States* v. *Thomas*, 488 F.2d 334, 335-336 (6th Cir. 1973); *United States* v. *Morrison*, 535 F.2d 223, 225, 228 (3d Cir. 1976). Both Smith and Talbert did take the stand, and the question for decision is whether the defendant was deprived of any significant testimony by reason of any wrongful action on the part of the prosecutor.

The defendant did get what he wanted out of Smith, namely, testimony to the effect that only he and Talbert had participated in the assaults. It may be true, as the defendant argues, that Smith's credibility was affected by evasive answers to the questions on cross examination as to whether he and Talbert had acted in concert or by prearrangement. If so, we are at a loss to know whether those answers were prompted by the judge's express admonition concerning the possibility of a prosecution for conspiracy,[10] by something the prosecutor may have said or done, or by the witness's natural instinct for self-preservation. For all that appears, what befell the defendant with Smith's testimony may have been nothing more than one of the legiti-

---

[10] It will be remembered that it was the judge, not the prosecutor, who had suggested this particular possibility.

mate fortunes of war under our adversary system of criminal justice.

We also have difficulty in concluding that the prosecutor was responsible for the defendant's coming up empty with Talbert. Talbert had in fact pleaded guilty to all the indictments against him, and both the judge and counsel for the defendant had been so advised. The judge was clearly in error when he ruled that the witness was privileged to refuse to answer bare bones questions as to whether he had committed the particular offences alleged in those indictments.[11] Counsel did not object to any of the judge's rulings. Contrast *Commonwealth* v. *Funches*, 379 Mass. 283, 287-291 (1979). He had fared badly with Smith, but two eyewitnesses for the prosecution had seen only two assailants, and there was always the possibility (as counsel urged in his closing argument) that the jury would believe those witnesses and conclude that the victim had been mistaken in believing there had been three assailants and in identifying the defendant as the third. We think it not unlikely that counsel made a tactical decision to let Talbert go by the boards. In all the circumstances, we are not persuaded that the loss of any helpful testimony which might have been obtained from Talbert was occasioned by any wrongful conduct on the part of the prosecutor.

3. The judge, in the course of his charge, told the jury that "[a] reasonable doubt is sometimes said to be a doubt for which a good reason can be given." The context of that instruction is set out in the margin.[12] What appears there

---

[11] A witness may refuse to testify unless it is *"perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate" (emphasis original). *Hoffman* v. *United States*, 341 U.S. 479, 488 (1951).

[12] "So what is 'reasonable doubt'? Well, a reasonable doubt is an honest and reasonable uncertainty as to the guilt of the accused existing in your mind after you have given a full impartial consideration to all the evidence and to the law. *A reasonable doubt is sometimes said to be a doubt for which a good reason can be given* [emphasis supplied]. Proof beyond a reasonable doubt does not [mean proof] beyond all doubt, nor

was preceded by proper instructions on the presumption of innocence and on the Commonwealth's burden of proof and was followed by an acceptable paraphrase of the "proof to a moral certainty" rubric of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130 n.12 (1977). There was no objection. When we consider the offending words in light of the evidence and the charge as a whole, we find no substantial risk of a miscarriage of justice. See and compare *Commonwealth* v. *Bjorkman*, 364 Mass. 297, 307-309 (1973); *Commonwealth* v. *Coleman*, 366 Mass. 705, 712 (1975); *Commonwealth* v. *Hughes*, 380 Mass. 596, 600-602 (1980).

*Judgments affirmed.*

---

[proof] beyond an imaginary whimsical or fanciful doubt, nor doubt without reason, nor proof beyond the possibility of innocence."