COMMONWEALTH *vs.* FRANK COLEMAN.

Suffolk.    November 4, 1974. — January 30, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Practice, Criminal,* Capital case; Disclosure of evidence before grand jury; Assistance of counsel; Exceptions: failure to save exception; Argument by prosecutor; Charge to jury. *Evidence,* Opinion: expert. *Error,* Whether error harmful. *Words,* "Homicide," "Reasonable doubt."

---

There was sufficient evidence to support a conviction of murder in the
    second degree in a case where the defendant claimed that he shot the
    victim in self-defense as the latter was advancing on him. [709-710]
The right to examine grand jury minutes .is not constitutionally
    grounded, and where a murder trial was prior to the decision in
    *Commonwealth* v. *Stewart,* 365 Mass. 99, there was no error in
    denying production of grand jury minutes in the absence of a showing
    of "particularized need." [710]
Upon a claim of ineffective assistance of counsel for the defendant at a
    murder trial by reason of counsel's failure to except at trial to:
    testimony of the medical examiner that the cause of death was
    "homicide"; omission of an instruction to the jury at the close of each
    day's proceeding not to discuss the case; a charge that reasonable
    doubt was "a doubt based upon a reason," and suggesting the analogy
    of decisions of "matters of importance in every day life"; a charge not
    particularizing certain conduct as self-defense; a `charge as to the
    distinction between "wanton or reckless" and "negligent" in regard
    to involuntary manslaughter; a failure, upon the jury's request for an
    additional definition of manslaughter, to instruct a second time upon
    involuntary manslaughter while giving instructions on voluntary
    manslaughter, where the defendant had asserted self-defense; closing
    argument by the prosecutor expressing a personal belief; and other
    aspects of his argument, it was held that such claimed errors were not
    so weighty or harmful as to show serious incompetency of counsel and
    resulting loss of substantial grounds of defense. [710-715]
This court in reviewing a murder case under G. L. c. 278, § 33E,
    concluded against reducing a conviction of second degree murder to
    manslaughter. [715-716]

INDICTMENT found and returned in the Superior Court on
November 12, 1971.

The case was tried before *Roy, J.*

*Timothy J. Wilton* for the defendant.

*Frances M. Burns,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J.    Tried by a Suffolk County jury upon an
indictment for first degree murder, the defendant was
found guilty of murder in the second degree and sentenced
to imprisonment for life. On this appeal subject to G. L.
c. 278, §§ 33A-33G, assignments of error upon timely ex-
ceptions attack the trial judge's denial of motions for
production of grand jury minutes and for a directed verdict.
The defendant also assigns error upon various rulings and
instructions at trial, and upon parts of the prosecutor's

closing argument to the jury, but no exceptions were taken at the time. It is the defendant's present submission that the very failure of his then counsel to object goes part of the way to establish that he was deprived of effective assistance of counsel, and he urges us so to find on the whole record. We are also asked in the interest of justice under our § 33E power to reverse for a new trial or to direct entry of a judgment of guilty of manslaughter in lieu of the present judgment. We first summarize the evidence.

On the evening of June 18, 1971, an all night card game got under way on the third floor of the defendant's house in Roxbury. Such games took place every weekend. The four-room third floor was nearly exclusively given over to these games, the other two floors being used as living quarters. The defendant testified that the games were his "concession"; he took his cut from the pot. On the particular night the number of players varied from time to time but there were about eight. There was some drinking; apparently the defendant was sober but the victim, Anderson ("Baybra") Walker, may have been affected by alcohol. In the early morning of June 19, the defendant left to pick up his wife. He returned to find a commotion. Anderson Walker (hereafter Walker) had been accused of cheating by one of the players, Henry Lee. Perhaps $20 was at issue. Walker got up to attack Lee and in the ensuing fracas Walker was grabbed by his brother T. C. Walker and a number of other players and restrained from striking Lee. The defendant, entering at this point, joined in subduing Walker. There was a fierce struggle, for Walker was enraged, but apart from some testimony that Lee drew a knife, it appears that weapons were not used. The fight moved to a sideroom off the gambling room. There, in much confusion, the defendant was punched in the nose by Walker, and blood flowed. The defendant left the fray and went into the third floor bathroom to wash up. Several minutes later, Walker, calmed down by T. C. Walker, returned with him to the gambling room to resume play. The defendant was then in the third floor bathroom or kitchen. After several more minutes, but before the game

could fully resume, Walker got up and went toward the kitchen. He was unarmed then as previously.

The layout now becomes relevant. The gambling room, dominated by the gambling table, is at the front of the third floor; off to one side is the room into which the fight had spilled. At the left rear corner of the gambling room there is an open doorway through which one passes after perhaps two steps to the left front corner of the kitchen. Immediately to one's left there is a sink at the left wall of the kitchen and a stove further along near that wall. In the center of the kitchen is a table. The rear wall has two windows with a small table between, on which stands a coffee pot. At the rear right corner of the kitchen (diagonally opposite the entry from the gambling room) is an open doorway leading immediately to a back staircase. Alongside the right wall is a couch. Near the right corner of the front wall of the kitchen is a door opening on a bathroom that apparently occupies a narrow space between the rear wall of the gambling room and the front wall of the kitchen.

As Walker stepped into the kitchen, he said — this is according to T. C. Walker, who was sitting at the gambling table near the doorway to the kitchen — "Frank, I had no quarrel with you. What you got? I know you got a little popgun for me. I ain't got no beef with you." In this version, the defendant answered, "I'm tired of you all breaking up my games. I make my living this way. Stop, Baybra. Don't come any further. If you do, I'll kill you before death gets to you." T. C. Walker said he then heard a single shot. He saw Walker, shot in the chest, fall near the sink. The defendant was standing by the coffee pot at the rear wall of the kitchen with a gun in his hand. T. C. Walker said, "Frank, you didn't have to shoot him. I had quieted him down before it was over. If he lives or dies, I'll get you."

T. C. Walker's testimony about the location of the body and as to where the defendant was standing just after the shooting was corroborated by Lee who had been sitting at the gambling table somewhat farther than T. C. Walker from the entrance to the kitchen, had run into the kitchen after the shot, and fled the apartment through the kitchen

back stairs. But Lee could not make out the words spoken before the shot; he recalled only something like "get back" repeated by the defendant, and perhaps a scuffling sound like someone moving. Walker's wife claimed also to have heard "Go back" but she was downstairs at the time. Jack Bennett, who had been dozing on the couch in the kitchen, could recall nothing, but confirmed T. C. Walker's account of where the body was.

In his testimony the defendant told a different story, evidently disbelieved by the jury, in which he claimed that he shot in self-defense. In his version, he was standing at or in the bathroom door when Walker, standing in the kitchen between the bathroom door and the kitchen entrance, grabbed his arm; the defendant snatched it loose and backed up, backing until he reached the rear wall of the kitchen, and asking Walker to get back. When Walker kept advancing, the defendant was afraid he would be killed, so he took out his gun and fired, without aiming, solely to scare Walker. Walker fell, said the defendant, not near the sink or entrance, but between the doorway to the gambling room and the bathroom door. The defendant admitted fleeing to Arkansas after the incident, but said he did so because of T. C. Walker's threat to get him; he later returned and gave himself up.

1. *Assignments upon timely exceptions.* (a) *Denial of directed verdict.* "[W]here competent evidence has been introduced in support of all the material allegations of an indictment, the weight and sufficiency of such evidence are ordinarily for the jury." *Commonwealth* v. *Hollis,* 170 Mass. 433, 436 (1898). The defendant says there was insufficient evidence of malice to support a finding of murder, but considering T. C. Walker's testimony about the defendant's statement to Walker, "I'm tired of you all breaking up my games," Walker's disruption of the game and the ensuing fight, the defendant's bloody nose, and the defendant's use of a gun (see *Commonwealth* v. *Kendrick,* 351 Mass. 203, 209 [1966]; *Commonwealth* v. *Leate,* 352 Mass. 452, 456 [1967]), we cannot say the jury were wrong in disbelieving the defendant's assertion that he meant

only to frighten Walker. Nor can we say that the jury erred in disbelieving the defendant's testimony about self-defense which was contradicted at critical points, for example, as to where the body lay. The jury's disbelief could also rest on Walker's "I had no quarrel with you," on the defendant's failure to call for help or even to rouse Jack Bennett, on the apparent distance between the unarmed Walker and the defendant when the gun was fired, and on the physical difficulties in the defendant's story of retreat, considering the location of the furniture in the room. Although it is argued that the defendant's apprehension was increased by the fact that he had previously lost the sight of an eye, the defendant's active intervention in the original fracas would suggest that he was not afraid of the victim.

(b) *Grand jury minutes.* There is no merit in the defendant's argument that denial of his demand to see the grand jury minutes deprived him of a constitutional right. At the time of trial, production of these minutes could be had under existing law only on a showing of "particularized need." Here no such showing was attempted; indeed the demand was a general one. Whether particularized need could have been shown, we cannot tell. In *Commonwealth* v. *Stewart,* 365 Mass. 99, 105-106 (1974), we changed our practice and enlarged the right to production, but that was not because we acknowledged a constitutional right; had we done so, we would have had to consider more carefully whether the change should be only prospective, as we ruled it to be. The Supreme Court's decision on disclosure of grand jury minutes, *Dennis* v. *United States,* 384 U. S. 855 (1966), is not constitutionally grounded.

2. *Assignments without supporting exceptions.* The defendant asks us to examine alleged errors not excepted to at the time, on a claim that they show on their face ineffective assistance of counsel. In appraising the claim we should not allow casual evasion of the basic rule that errors not objected to are waived. *Commonwealth* v. *Stout,* 356 Mass. 237, 243 (1969). Ineffective assistance is proved by showing not only serious incompetency of counsel but also resulting

loss of substantial grounds of defense, see *Commonwealth*
v. *Saferian, ante,* 89, 98 (1974), and in the present case the
showing would have to be made without the usual help of a
postjudgment motion developing circumstances beyond
the trial record itself. And while we may in discretion under
§ 33E consider errors not timely brought to the attention of
the trial judge, see *Commonwealth* v. *Lussier,* 364 Mass.
414, 425 (1973), we do not do so lightly and in all events we
require a demonstration of grave prejudice to the defendant
before we will act. With these cautionary remarks we
examine whether errors were committed and if so what was
their probable weight.

(a) *Testimony of medical examiner.* The medical ex-
aminer testified that in his opinion the cause of death was
"homicide." We observed in *Commonwealth* v. *Lannon,*
364 Mass. 480, 482 (1974), that the better course was to
exclude such opinion testimony, but here it was innocuous.
In the *Lannon* case, accident was offered as a defense, and
"homicide" could be taken to contradict that defense
theory; here "homicide" does not seem to have such a
contradictory implication as to the defense theory of self-
defense, i.e., justifiable homicide. We should add that in
the present case the medical examiner went into detail
about the autopsy procedure he had followed to reach the
conclusion of death by "gunshot wound of the chest,
massive hemorrhage, and homicide," and the jury could
not have imagined he was expressing an expert opinion on
how the shot came to be fired, as opposed to the results of
the shot.

(b) *Omission of instruction not to discuss case.* The
judge did not instruct the jury at the close of each day's
proceedings not to discuss the case among themselves or
with others. It appears preferable to do so for safety's sake,
but it has been held not reversible error to omit the
instruction, unless perchance resulting prejudice is shown.
*Myres* v. *United States,* 174 F. 2d 329 (8th Cir. 1949), cert.
den. 338 U. S. 849 (1949). *United States* v. *Carter,* 430 F. 2d
1278 (10th Cir. 1970). *Rotolo* v. *United States,* 404 F. 2d 316
(5th Cir. 1968). *United States* v. *Viale,* 313 F. 2d 595

(2d Cir. 1963), cert. den. 373 U. S. 903 (1963). Cf. *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 298-299 (1971), cert. den. sub nom. *Farrell* v. *Massachusetts,* 407 U. S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U. S. 914 (1972) (in absence of demonstrated prejudice, not reversible error to refuse to give requested instruction that jury not read newspapers or listen to radio or television accounts of the proceedings). There is no showing or intimation of prejudice here.

(c) *Jury charge.* (i) *Reasonable doubt.* First it is claimed the judge erred in his charge on "reasonable doubt," especially when he said it was "a doubt based upon a reason," thereby, so it is argued, shifting the burden of proof to the defendant. In *Commonwealth* v. *Bjorkman,* 364 Mass. 297, 307-309 (1973), we held the same charge, all but word for word, to be satisfactory. Another phase of the charge in the present case, putting an analogy to how one decides matters of importance in everyday life, we criticized in *Commonwealth* v. *Ferguson,* 365 Mass. 1, 11-12 (1974), but we thought it not harmful in light of the charge as a whole. We make the same judgment here, but express the wish that the analogy, which tends to confuse rather than enlighten, will no longer be employed.

(ii) *Self-defense.* The judge gave a conventional charge on self-defense, which is criticized on the ground that it did not tell the jury specifically that if the defendant fired his gun only to frighten the victim (with other qualifiers), then he could not be found guilty. In relation to the whole charge as given, this was merely a complaint of a failure to particularize or give an example of action that should count as valid self-defense. It might have been well to focus the mind of the jury by this kind of instruction, but it was hardly an error, and surely not a serious one, not to do so.

(iii) *Involuntary manslaughter.* The defendant was convicted of second degree murder, and the charge as to murder is not complained of. It is not made clear in the particular circumstances of the present case how he could have been harmed in a practical way by an erroneous charge regarding involuntary manslaughter. That charge,

however, was not erroneous. This distinction between "wanton or reckless" and "negligent" could have been put more pointedly but we think it was sufficiently brought out. Though the charge was not the traditional one, see *Commonwealth* v. *McCauley,* 355 Mass. 554, 560 (1969); *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967), it adequately conveyed the gist of the offense. See *Commonwealth* v. *Welansky,* 316 Mass. 383, 396-401 (1944).

(iv) *Omission to charge on involuntary manslaughter.* When the jury returned after about two and a half hours of deliberation and requested "a definition of manslaughter and murder, second degree," the judge again defined second degree murder and voluntary manslaughter, but did not again define involuntary manslaughter. No doubt the judge would have repaired the omission if requested. The defendant says that his testimony that he shot only to scare the victim made involuntary manslaughter a plausible verdict. See *Commonwealth* v. *Kinney,* 361 Mass. 709, 712 (1972). Be that as it may, and putting to one side that involuntary manslaughter had been already once charged, the fact is that the defendant chose to assert his innocence on a theory of self-defense, his assertion that he did not aim being used to counter the possibility of a finding that excessive force had been used. This puts the emphasis on voluntary, not involuntary manslaughter. For aught that appears, defense counsel might have preferred not to have the possibility of a verdict of involuntary manslaughter rubbed in at this stage.

(d) *Prosecutor's closing argument.* After a long and argumentative summary of the evidence, the prosecutor said to the jury: "I suggest to you when you add up the sum total of the evidence in this case, that you will agree with me. This killing was intentional . . . ." We have noted in previous cases that it is a serious impropriety for a prosecutor to express a personal belief in the defendant's guilt. In *Commonwealth* v. *De Christoforo,* 360 Mass. 531, 538 (1971), no specific instruction was given to cure the prosecutor's blunder, but the judge did remark in his instructions that counsel in closing "very often become over-

zealous. Closing arguments are not evidence for your consideration," and we found these statements sufficient to avert prejudice. In the present case the judge did not mention overzealousness of counsel, but he did repeatedly emphasize that the jury were the sole judges of the facts, and we think the jury could relate these cautions to the prosecutor's closing argument; besides, "the jury knows that the prosecutor is an advocate and it may be expected, to some degree, to discount such remarks as seller's talk."[1] Nevertheless we are not to be taken as condoning the prosecutor's statement, and repeat our disapproval of such slips.

The defendant now complains of the prosecutor's statement that he was "surprised" the defendant had not urged accident instead of self-defense, which was followed, says the defendant, by an erroneous statement by the prosecutor of the law of accidental killing. As to the latter, accident was not seriously pressed by the defendant, so it is hard to see how any reference to the relevant law could work practical prejudice, especially as the prosecutor made the usual statement that it was for the judge to instruct on the law. A prosecutor's criticism of trial tactics of the defense, without an attempt to bring in damaging information outside the record, is not proscribed. See *Commonwealth* v. *Dunker*, 363 Mass. 792, 799-800 (1973).

There is argument that the prosecutor made mistakes in summarizing testimony, and thereby misled the jury. The prosecutor did not in closing make the customary disclaimer that his remarks were not evidence, but he had done so in his opening statement, and the defense counsel in closing made a similar general statement, to which is to be added the judge's caution already cited. But it is doubtful that there was any significant distortion of the testimony. Summarizing the statement of the defendant as testified to by T. C. Walker, ending with "If you do [come

---

[1] The quotation is from *DeChristoforo* v. *Donnelly,* 473 F. 2d 1236, 1238 (1st Cir. 1973), where the Court of Appeals for the First Circuit denied habeas corpus on this ground but granted it on other grounds, and was reversed in *Donnelly* v. *DeChristoforo,* 416 U. S. 637 (1974).

closer], I'll kill you before death gets to you," the prosecutor omitted the conditional "If you do." But we think the conditional meaning remained apparent. Again, discussing his cross-examination of the defendant, the prosecutor said, "Do you recall, I asked him, 'Did he swing at you?' 'No.' 'Did he lunge at you?' 'No.' '" The defendant protests that no question was asked about "lunging." In fact a question was asked, "Did you punch or tussle with him at that time," which was answered, "I snatched a-loose from him," and "He just grabbed me by the arm and I snatched a-loose." It was clear on the defendant's version that there was such a contact and none thereafter, and we do not believe the prosecutor's remarks made a serious impression.

To sum up, considering each assignment without underlying exception, and then all together, we find that they are not weighty, and by no means do they attain to the degree of harm, of which we spoke at the outset, that would be needed here as a basis for reversal.[2]

3. *Section 33E discretion.* It remains to consider whether there is sound basis, taking the whole record together, for exercising discretion under § 33E to reduce the conviction to manslaughter. Manslaughter in the "heat of passion" sense is not plausible because there was time for cooling off. We are left with the possibility of reading the record as indicating voluntary manslaughter through use of excessive force in otherwise rightful self-defense, or involuntary manslaughter through wanton and reckless use of force intended to scare and not to kill. The defendant urges three cases upon us in which we reduced convictions to manslaughter, and, although § 33E review is not simply a process of "color matching," we have considered those cases in relation to the present. The first case of reduction, *Commonwealth* v. *Ransom,* 358 Mass. 580 (1971), rests on

---

[2] There is a last claim that incompetency of counsel is shown because he failed to seek compulsory process for a potential witness until the second morning of the three-day trial, and the witness was not found. Presumably this witness was a participant in the card game, but there is no showing of what he knew, or indeed that he would have been found if process had issued earlier.

"heat of passion" which, as indicated, is not germane to our case. We have nothing to match a sudden stabbing of the defendant, the deceased chasing the defendant, a final fight to death with knives. In the present case, apart from the lapse of time after the fracas, on the weight of evidence there was no physical contact in the kitchen. In *Commonwealth* v. *Baker,* 346 Mass. 107, 119 (1963), we concluded that "the intention to shoot was formed in the heat of sudden affray or combat." Immediately before the fatal shot the deceased had struck the defendant and was advancing on him belligerently at close range accompanied by friends. Even if that case is read as one based on excessive force in self-defense, it is remote from our facts — here we have the defendant across the room from where the body fell, most probably no prior physical contact in the kitchen, help accessible in the adjoining room. In *Commonwealth* v. *Kinney,* 361 Mass. 709 (1972), the defendant shot the deceased after they had exchanged blows just outside the defendant's apartment. The defendant was not the aggressor and his exculpatory evidence, consistent generally with the prosecution's case and corroborated, was that the deceased had made a prior threat to get him, and that he was hit on the head and became dizzy early in the fight. "The weight of the evidence clearly [was] that he was confused and frightened." *Id.* at 713. We cannot fairly say the same here, and our facts are quite different. Considering that our power under § 33E is to be used with restraint, see *Commonwealth* v. *Mazza, ante,* 30, 33 (1974), we conclude against discretionary relief.

*Judgment affirmed.*