COMMONWEALTH vs. WILLIAM MORRILL GILDAY, JR.

Suffolk.    January 7, 1975. — April 25, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Homicide.   Jury and Jurors.   Practice, Criminal,* Sentence, Capital
case, Charge to jury, Disclosure of evidence, Suppression of evi-
dence by prosecutor, Argument by prosecution, New trial, Fair
trial.   *Identification.   Evidence,* Of flight, Of consciousness of
guilt.   *Error,* Whether error harmful.

Where a sentence of death for first degree murder was constitutional-
ly invalid under *Furman* v. *Georgia,* 408 U. S. 238 (1972), it was
proper to vacate the death sentence and to impose a sentence to
life imprisonment; a new trial was not required.   [485-486]
There was no error in denial of a motion for a new trial of a murder
and armed robbery case in so far as an asserted ground of know-
ing suppression of exculpatory testimony of a certain person by
the prosecution was concerned, where it was warrantably found
by the trial judge that no statement of such person of any kind
had been in the possession of or known to the prosecution [486-
489]; nor was abuse of discretion in denial of the motion shown
with respect to an asserted ground that such person had made a
statement inconsistent with testimony given by him at the hearing
on the motion [489-491].
Where it appeared that at a trial for murder and armed robbery a
codefendant pleaded guilty to manslaughter, gave detailed testi-
mony of the defendant's guilt, and denied that any threats or
promises had been made to him by the prosecution, that at the
hearing on a motion for new trial there was evidence from others
that the witness had told them after the trial that there had been
prosecution threats and promises, but that the witness himself
testified at the hearing denying such threats and promises and
maintaining that he had testified truthfully at the trial, conclusions
by the trial judge that the witness had testified truthfully at the
trial and at the hearing were dispositive of the asserted ground of
the motion, that the witness had perjured himself at the trial and
that the prosecution, knowing of the perjury, had done nothing to
correct it.   [486-487, 489-491]

In all the circumstances, the defendant in a case involving armed robbery of a bank and killing of a police officer, where trial was not begun until more than sixteen months after the crimes, was not denied a fair trial by reason of extensive publicity at the time of the crimes and renewed publicity occasioned by an attempt of the defendant to escape from jail shortly before the trial. [491-493]

G. L. c. 265, § 2, requires that a determination by the jury that the death penalty not be imposed in a murder case is to be made "upon . . . consideration of all the evidence," and there was no error in excluding veniremen who, as a matter of personal opinion opposing capital punishment, would vote for a penalty of life imprisonment and thus did not stand indifferent on the issue of clemency [493-494]; nor was a class of jurors thereby eliminated thus rendering the Commonwealth's right of peremptory challenge more valuable [494].

Pre-trial procedures in which a witness identified a photograph of the defendant in a criminal case were not so impermissibly suggestive and conducive to irreparable misidentification as to constitute a denial of due process of law under the Fourteenth Amendment to the Federal Constitution. [494-496]

In a robbery and murder case, the probative value on the issue of consciousness of guilt of extensive evidence of flight by the defendant, including kidnapping and shooting at police officers, was not outweighed by its effect of concomitantly introducing evidence of other crimes, and admission of the evidence of flight did not result in constitutional error. [496]

Repeated references by the prosecutor in a criminal case to the defendant in closing argument as an "old pro" was not constitutional error in the circumstances. [496-497]

There was no error in a serious criminal case in a charge inviting the jury to consider "vital action" taken by them in their "everyday lives," and the weighing of "pros and the cons" preparatory to a decision, where the judge did not refer to any specific types of important decisions from the lives of the jurors and his charge did not lessen the Commonwealth's burden of proof. [497-498]

INDICTMENTS found and returned in the Superior Court on October 1, 1970.

The cases were tried before *McLaughlin, C.J.*

*Daniel F. Featherston, Jr.,* for the defendant.

*John T. Gaffney,* Assistant District Attorney (*James M. McDonough,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

HENNESSEY, J. This is an appeal under G. L. c. 278, §§ 33A-33G, of the defendant's convictions, after a jury trial, on an indictment for first degree murder and two indictments for armed robbery. The defendant was sentenced to death on the murder charge, the jury not having recommended that the death penalty not be imposed. Life sentences, to be served concurrently, were imposed as to the armed robbery convictions.

Thereafter, the case of *Furman* v. *Georgia,* 408 U. S. 238 (1972), was decided, and the defendant moved for a new trial as to the murder indictment on the ground that the *Furman* case established that a death sentence could not constitutionally be imposed and that therefore the trial judge could not legally impose a sentence of life imprisonment or any other sentence. The judge denied the motion, after hearing, and imposed a sentence of life imprisonment as to the murder conviction. After hearing, also, the judge denied a second motion for a new trial, which had been filed in the Supreme Judicial Court and remanded to the Superior Court for disposition, and in which the defendant alleged the wrongful suppression of certain evidence by the Commonwealth.

The defendant argues nine assignments of error, which relate to: (1) error of the judge in imposing a life sentence on the murder conviction on the first motion for a new trial; (2) error in the denial of the defendant's second motion for a new trial; (3) error in that he was deprived of a fair trial before an impartial jury by reason of widespread pre-trial publicity in the news media; (4) the erroneous exclusion of six potential jurors because of certain views on capital punishment; (5) examination by the prosecutor before the jury into the subject matter of a certain letter; (6) error in permitting eyewitnesses Becker and Gaudette to testify, respectively, to an in-court identification and a photographic identification of the defendant; (7) the admission in evidence of extensive proof of the defendant's flight after the robbery and murder, on the issue of consciousness of guilt, since proof

of the flight involved kidnapping, and shooting at police officers; (8) denial of due process of law to the defendant by the prosecutor's false and impermissible characterizations, in final argument, of the defendant as a professional criminal; and (9) error in the judge's charge to the jury as to the definition of reasonable doubt.

There was no error, nor, as shown later in this opinion, do we find this to be an appropriate case in which to afford relief under G. L. c. 278, § 33E. We affirm the judgments.

The defendant was indicted on the murder and robbery charges on October 1, 1970, along with Stanley R. Bond, Robert J. Valeri, Susan E. Saxe and Katherine A. Power. The victim of the murder was Boston police Officer Walter A. Schroeder who was shot in the course of the armed robbery of the Brighton branch of the State Street Bank and Trust Company on September 23, 1970. On motion of the defendant, his trial was severed from that of Bond; the two women were not apprehended; and Valeri pleaded guilty and was sentenced for the crime of manslaughter, after testifying as part of the Commonwealth's case in chief against the defendant.

The trial of the case consumed five weeks. The Commonwealth's evidence showed, in general, that Bond, Valeri and Saxe entered the bank carrying guns, robbed it and drove off in a blue Chevrolet; that Gilday, armed with a semiautomatic rifle, was seated in a white Ambassador automobile across the street from the bank; that after the other three had escaped from the scene, Gilday fired a number of shots at two policemen who arrived, and Officer Schroeder thereby sustained the wounds from which he died the next day. Bond, Valeri, and Saxe later switched to a third vehicle, a station wagon driven by Power, and made their escape. Gilday also escaped in the white Ambassador.

The evidence reveals an odyssey of violence against a background of political revolution, or at least pretensions of revolution.

We summarize only the most significant evidence, and observe at the same time that there was much other testimony which tended to support an inference of the defendant's guilt on all indictments. The witness Francis Goddard testified that he had seen a man firing at the bank, and his testimony as to the man's description was consistent with the defendant's appearance. The witness Bernard Becker identified Gilday before the jury as the man who fired the rifle at the bank on the day in question. The witness Andrew Gaudette testified that he saw a man in a white sedan firing a weapon toward the bank, and that he had identified a photograph of Gilday, among a group of photographs shown to the witness, as the man who fired the gun. Gaudette failed to identify Gilday before the jury, at a time when Gilday was seated among the spectators in the court room.

The witness James A. Fox, a licensed firearms dealer in New Hampshire, testified that he had sold a .45 caliber semiautomatic rifle, and other weapons, to the defendant on September 5, 1970, and that the defendant was accompanied by Bond. The defendant and Bond fired test rounds from the weapon into a sandbank. He identified a semiautomatic rifle, which had been found in Bond's luggage at the time of Bond's arrest in Colorado after the murder and robbery, as the one he sold to the defendant. A ballistics expert testified that bullets and spent casings recovered from the New Hampshire sandbank, from the police car of Officer Schroeder, from in and around the Brighton bank, and from the area where the white Ambassador had been, all were fired from the semiautomatic rifle in evidence that had been sold to Gilday and later found in Bond's luggage.

The blue Chevrolet, which had been used by Bond, Saxe, and Valeri in the robbery, was recovered by the police. It was shown that an Ontario license plate on the vehicle had been stolen from a vehicle in the parking lot of the Huntington Avenue Y. M. C. A. in Boston

where Gilday at the time lived. Gilday's thumb print was found on the license plate.

Alan McGrory testified that he knew the defendant and that he also knew Stanley Bond and Robert Valeri; that in September, 1970, he was living in a Northeastern University dormitory, and the defendant Gilday was residing at the Huntington Avenue Y. M. C. A., a few blocks away. On September 20, 1970, he was with Gilday in a bar; that Gilday told him he, Gilday, was "in on something good," a revolutionary cause, with all kinds of professors and businessmen involved who had no police records. Gilday showed him a .38 caliber pistol and bullets. Gilday told him there were girls involved, who would do away with anybody who would hurt the group.

McGrory stated that on September 23, 1970, at 12:30 A.M. Gilday came to see McGrory at the latter's apartment, and McGrory saw Bond and Valeri outside on the sidewalk. Gilday then told McGrory that he had told Bond and Valeri about him. Gilday said that he had told Bond and Valeri that McGrory wanted to see change and did not have much time to effect it, and that McGrory would have no qualms about killing people. He implied that McGrory should confirm these statements to Bond and Valeri. The witness McGrory testified that he and Gilday went out to meet Bond and Valeri and entered the white Ambassador; that Bond asked him why he wanted in, and the witness stated he wanted to see change; that he did not have long to achieve it; and that he was prepared to go to war with the establishment, depending on whom he was with, and the means used. Gilday then stated again the kinds of people involved, who had no criminal records, and who would "blow the wall[s] of Walpole down if need be." Gilday repeated that there were girls involved who were willing to kill if necessary, and that the group had police and army radios, submachine guns, and bazookas.

About 2:30 P.M. that same day, the day of the robbery and murder, the defendant came to McGrory's room. Bond was outside on the street, casually talking to a driver in a taxicab. At that time the witness McGrory said to Gilday, "I was sick to hear that two guys and a girl and an old reprobate had robbed a bank and critically wounded a police officer." Gilday answered that he had not heard about it. Then the two tried to get the news on the radio without success. Gilday then said that he did not think the officer was going to die, and that, even if the officer did die, he, Gilday, had nothing to lose. Gilday warned McGrory that even if Gilday were imprisoned on death row, he would take care of McGrory if he said anything. At this point Gilday gave the witness some money from a large roll of bills, and asked the witness whether he would be ready to leavé that afternoon for the west coast. Gilday offered to get the witness a gun.

Robert J. Valeri stated that he had met Gilday and Bond in 1969, and Saxe and Power in 1970 at Brandeis University, and that in September he was a student at Northeastern University, and the group met in two apartments, one at 337 Beacon Street, Boston, rented by Bond, and the other at 163 Beacon Street, Boston, rented by Power. The witness testified that he knew the witness McGrory, and corroborated McGrory's account of the meeting in the early morning hours of September 23, 1970; that after McGrory had been left at his residence, Gilday, Bond, and he, Valeri, returned to 337 Beacon Street, where they met with Saxe, Power, and one Michael Fleischer; that, earlier that evening, sometime after 7 P.M., the same group had discussed the robbing of a bank; and that Bond had gone to locate the bank, and on his return, told them the bank was to be the branch of the State Street Bank and Trust Company in Brighton. The witness testified that plans were made that Saxe, Bond, and Gilday were to enter the bank, and Valeri was to stay outside, but the following morning

Gilday asked Valeri to go in while Gilday remained outside. Bond was to carry a 9 mm. Browning; Gilday, a shotgun and a .38 caliber pistol; Saxe, a .30 caliber carbine and pistol; and Valeri, a semiautomatic weapon and a .357 Magnum, but the plans were changed, and Gilday took the semiautomatic weapon, and he, Valeri, took the shotgun. According to Valeri's testimony plans were made for Bond, Saxe, and Valeri to use the blue Chevrolet; Gilday was to have the white Ambassador; and Power was to use a 1961 or 1962 Ford station wagon, which Gilday had purchased. The witness testified that he stole the blue Chevrolet in Springfield, Massachusetts, and that just before leaving for the robbery, Gilday changed the plates and put on the Ontario plate. The witness testified that he had seen the semiautomatic weapon prior to September 23, and Gilday told him that he and Bond had bought the weapon in New Hampshire.

Valeri further stated that, when they left the Beacon Street area, Bond was driving the blue Chevrolet, Gilday the white Ambassador, and he, Valeri, was driving the station wagon; that, on a side street, Power took the station wagon as the switch car, and he, Valeri, joined Bond and Saxe in the Chevrolet; that the two vehicles proceeded to the bank, and Gilday took his position in the white Ambassador with the New Jersey plates, on Western Avenue near the corner of Everett Street; that he, Valeri, Bond, and Saxe entered the bank, and when the tellers were slow in giving up the money, Bond fired two quick shots in the bank; that Bond took the money in bags, and they left the bank; that they drove from the bank, met Power, abandoned the Chevrolet, and drove away in the Ford station wagon, with Bond and himself lying in the back under a rug. The witness said he was dropped at Roberts station in Waltham from where he took a train to North Station, Boston, and proceeded to 163 Beacon Street. When he arrived, Bond and Fleischer were present, and the girls later returned. Gilday came

in after the girls, and he had with him a suitcase containing the semiautomatic weapon. Bond asked Gilday what had happened, and Gilday said he stayed there and waited, and when the police officer came, he opened fire on him, and Bond and Valeri of the others asked why he, Gilday, had waited, and Gilday said that "he had always wanted to shoot a police officer."

Stanley R. Bond was called as a witness by the defendant. He testified that in 1970 he was paroled from the Massachusetts Correctional Institution at Walpole, where he had known the defendant Gilday and the witnesses Valeri and McGrory; that after his release from prison, he became acquainted with Susan Saxe, Katherine Power, and Michael Fleischer; that, in the summer of 1970 and thereafter, the four persons, with Valeri after his release, formed a revolutionary group. In the summer of 1970, he, with Valeri, Saxe, and Power, had robbed banks in Chicago, Philadelphia, and California.

Bond also testified that he saw Gilday in the summer; that Gilday was not politically oriented; that he was present when Gilday purchased the semiautomatic weapon, with other guns; and that he and Gilday bought the Ford station wagon. The witness admitted that he saw McGrory on the night before the robbery; that Valeri was the one who wanted McGrory in with the group; and that the meeting with McGrory did take place substantially as testified to by McGrory.

Bond stated that Gilday had stolen license plates for the group, one of which was used in the State Street bank holdup, but the witness was not sure on which car the plate had been used. However, Bond testified that Gilday was not directly involved in a prior robbery planned in New York but not executed.

Bond also testified that he thought he drove the blue Chevrolet, that Michael Fleischer drove the white Nash, and that Power drove the station wagon. At one point, the witness said, "Mike had pulled up across the street." They drove around the bank. Saxe then went into the

bank to see if the vault was open. After she returned to them, they parked the car and Bond, Saxe, and Valeri entered the bank together. Bond took the guard's gun. When the tellers hesitated, he fired one shot from his weapon. Bond and the others took the money in bags and left. They drove to the switch car site, joined Power, then dropped Power off on Route 9, and Valeri in Waltham. The witness Bond left the station wagon in Waltham, and took a cab back to the apartment on Beacon Street. When he arrived, Power was there and told him a "cop" had been shot. Saxe returned, then Valeri, and finally the defendant Gilday and Fleischer arrived at the same time. Later that evening, Bond drove Gilday to Brandeis University and told him to drive the station wagon somewhere, and he gave Gilday $1,000. Bond testified that he and Power left Boston by car; that Saxe and Fleischer went to the Logan airport; and that the four were together again in Philadelphia.

Bond further testified that he was sure that Gilday knew that he, Bond, was involved in robbing banks and in other activities, and that Gilday had participated in a breaking and entering of the Newburyport armory together with himself, Saxe, Power, and Valeri. The witness testified that he did not see Gilday on September 23, 1970, until after noon, and that Gilday must have put the Ontario plate on the blue Chevrolet the night before and that, when he saw Gilday at noon, Gilday was drunk.

The defendant testified and admitted that he knew Bond and that he had bought the semiautomatic weapon, but he claimed that he was sick from drinking at the time. Gilday acknowledged that he was a frequent visitor with Bond, Valeri, Saxe, Power and Fleischer at the Beacon Street apartments, and admitted he had been carrying a gun on his person from about September 16, 1970. He further stated that he had stolen the Ontario plate and that he had purchased the Ford station wagon, the sale being made in the name of one Sheldon Gelman,

as Bond had identification papers for Sheldon Gelman. The defendant testified that on September 20, 1970, he had driven Kathy Power to the armory at Newburyport and waited near by, but he asserted that he was drunk at the time and had fallen asleep in the back seat and only later learned that Bond, Valeri, and Saxe had obtained radios and other material from the armory. The defendant admitted, however, that he had shown them a circuitous route from Newburyport to Boston.

The defendant also testified that he knew the witness McGrory; that on the evening of September 22, 1970, he was at 337 Beacon Street, and knew that Bond, Valeri, and two girls were planning something, but did not know exactly what; that he saw McGrory with Bond and Valeri, and further verified substantially what McGrory had stated; that, after the meeting with McGrory, he returned to his room at the Y.M.C.A. at which time he slept, awakening about 7 A.M. on September 23, the day of the robbery. Gilday stated that on that morning he had taken a few drinks, went to downtown Boston for some shopping, visited a political headquarters, and registered to vote at a booth on Boston Common shortly after 11 A.M. According to Gilday's testimony he then went to Northeastern University. Unable to operate the elevator, at the university, he went to Dean Garland at the school about 12:30 P.M. to get a key. He visited another bar and heard news reports of the holdup and first went to 337 Beacon Street. He then went to the other apartment where Bond, Saxe, Power, and Fleischer were "yelling and hollering" and charging each other with things, and he took some of the holdup money and left. The defendant further testified that he went to pick up some clothes that had previously been purchased, then went for more drinks. He testified, although not entirely certain of the sequence of events, that he then revisited Bond, finally returning to the Y.M.C.A. where Bond picked him up and drove him to Waltham to get the station wagon. At this point Bond gave him $1,000, but,

although he asked Bond to take him with him, Bond refused.

In rebuttal, Michael Fleischer testified that he knew Bond, Saxe, Power, and Valeri, and met Gilday in September, 1970; that he was in sympathy with aims to change society, but did not agree with Bond's plan to rob banks to finance a general uprising; that on September 22, 1970, he heard a discussion between the five concerning the robbery of a bank on September 23, 1970; that he saw many guns in the apartment at 337 Beacon Street; and that he helped the five load things into the three cars, and he then went back to the apartment at 163 Beacon Street. The witness testified Power returned first, then Bond and Valeri. Gilday arrived approximately fifteen minutes later, and finally Saxe returned. There was a discussion about shooting the "cop," and Saxe and Power accused Gilday of being "trigger-happy" and said that it was "a real stupid thing to do to shoot the cop," and Gilday said, "What did you want me to do, the cop was right there, he was only thirty seconds behind you."

1. The defendant's first motion for a new trial was based on the principles of *Furman* v. *Georgia,* 408 U. S. 238 (1972), which were announced some months after the verdicts in this case had been returned by the jury. The trial judge denied a motion for a new trial and sentenced the defendant to life imprisonment. There was no error. Imposition of the death sentence in the circumstances of this case was, as shown by the subsequent *Furman* case, an unconstitutional exercise.

The defendant argues in his brief that a new trial is required on the murder indictment. His basic premises are that the power to impose sentence in a murder case must, under Massachusetts law, have a statutory basis, and that under the controlling statute (G. L. c. 265, § 2), only a jury can determine the sentence.

We have decided this precise issue in several cases which were considered by us after the *Furman* case. See

*Commonwealth* v. *LeBlanc,* 364 Mass. 1 (1973); *Commonwealth* v. *Valliere,* 366 Mass. 479 (1974); *Commonwealth* v. *Stone,* 366 Mass. 506 (1974). *Commonwealth* v. *Harrington, ante,* 13 (1975). Nevertheless, the defendant, in his brief and in a reply brief addressed solely to this issue, presses his argument that we have not as yet in any relevant case shown any reasons supportive of our conclusions. We disagree, both as to the defendant's argument that a new trial is required and his further argument that detailed reasoning should now be expounded. The jury in this case decided that the defendant was guilty of murder in the first degree and that the most severe penalty permitted by law (death) should be imposed. Since the trial judge, in subsequently vacating the death sentence and imposing a life sentence, satisfied the requirements of the *Furman* case, we believe that neither a new trial nor further discussion of the issue is required.

2. The defendant claims error in the denial of his second motion for a new trial, in which he asserts denial of due process of law based on two grounds. First, the motion alleges that the Commonwealth knowingly suppressed the testimony of one Michael Finn which the defendant maintains would have been relevant and exculpatory. This claim is to be considered in light of the pre-trial order by the judge to the Commonwealth which should fairly be construed as requiring the Commonwealth to provide the defendant's counsel with "any and all statements of witnesses to the robbery of the Brighton branch of the State Street Bank and Trust Company on September 23, 1970, whether verbatim or statements reported by others, which describe the participants in the robbery as being persons whose descriptions differ in any way from the appearance of William J. Gilday, Jr."

Second, the motion alleges that the witness Robert J. Valeri, a codefendant and prosecution witness, perjured himself when he testified at the trial that no promise of

consideration had been made to him by the district attorney's office in exchange for his testimony. Moreover, it is claimed that the prosecutor, with full knowledge of this perjured testimony, did nothing to correct it.

After an evidentiary hearing, the judge denied the motion, and made extensive findings of fact.

We consider first the claim concerning Michael Finn. From a time immediately after the murder, it was known to both the prosecution and the defense that Finn claimed to have witnessed the shooting of Officer Schroeder. Colloquy during the trial disclosed that both sides were aware of Finn's reputation for mental instability and alcoholism. All concerned appear to concede that he was a witness to the crime.

To demonstrate constitutional error three elements must be shown: (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963). *Moore* v. *Illinois*, 408 U. S. 786, 794-795 (1972). Cf. *Commonwealth* v. *Hurst*, 364 Mass. 604 (1974). In so far as the motion related to Finn, the denial of the motion was without error, principally because the judge found, on evidence which warranted the finding, that there was no statement of Finn, exculpatory or otherwise, in the possession of the prosecution. Cf. *Commonwealth* v. *Stone*, 366 Mass. 506, 510-511 (1974). The judge made other important findings as shown later, which also support his ruling in denying the motion.

Neither side called Finn as a witness at the trial. The defendant's counsel now argues that he expected that the prosecutor would call Finn to the stand. He also claims that he was never able to get Finn to give him a statement, or even to talk to him. As we stated in *Commonwealth* v. *Stone, supra,* at 511, "The prosecution's mere failure to obtain conceivably exculpatory information from a potential witness does not constitute

suppression of evidence, at least here where there is no allegation that the defendant was denied access to the witness."

About a year after the trial, Mr. Joseph F. Flynn, an attorney connected with the Prisoners' Rights Project and who had taken an interest in the defendant, discussed the case with Finn.  He informed defense counsel of the content of the conversation with Finn, and this information was in part the reason for counsel's filing this second motion for a new trial for the defendant.

By affidavit and by his testimony at the hearing on the motion, Mr. Flynn informed the judge that Finn had described to him in detail the appearance of the man who shot Officer Schroeder.  This description (of a man about twenty-five years old, with moderately long hair and whose appearance was more consistent with that of Stanley Bond than that of William Gilday) was clearly exculpatory of the defendant.  Mr. Flynn's version of the statement made by Finn was corroborated by Mr. Flynn's wife, who was present during the interview with Finn. Mr. Flynn also testified that Finn had said that he had given a written description of the person who shot the officer to the Boston police and the Federal Bureau of Investigation (F. B. I.).

Finn also testified at the hearing on the motion for a new trial, and gave a description of the man who shot the officer in terms which were consistent with the appearance of the defendant.  The judge further found, on evidence which warranted the findings, that Finn had given to the F. B. I. a statement which was contradictory of his present testimony concerning the description of the man who fired the rifle.  Nevertheless, the judge found that the F. B. I. never gave this statement, or any information concerning it, to "any authorities of Suffolk County or of the Commonwealth of Massachusetts."  He further found that neither the police nor the district attorney's office intimidated Finn as to the events surrounding the shooting of Officer Schroeder, and

additionally he found that Finn was never told by the police not to talk to anyone about the case.

Essentially, and most importantly, the judge found that the police and prosecution had neither been in possession of nor had knowledge of any statement made by Finn that was exculpatory of the defendant. Of importance, also, were his findings, inter alia, that defense counsel did not call Finn to the stand at the trial for tactical reasons; and that Finn in 1970, and at the time of the hearing before the judge in 1973, was an unreliable witness, a fact apparently recognized by the district attorney's office at the time of trial, and which prompted their decision not to call him as a witness. See generally *Commonwealth* v. *Franklin,* 366 Mass. 284, 292-295 (1974).

Clearly no constitutional error has been demonstrated as related to Finn. The defendant, however, also argues that entirely aside from the concept of constitutional error, the showing of Finn's prior inconsistent statement requires that a new trial be granted. We disagree. In this aspect, the motion for a new trial rested in the judge's sound discretion. No abuse of discretion is shown in the judge's ruling. Cf. *Bartley* v. *Phillips,* 317 Mass. 35, 38-44 (1944). The testimony of Finn at the hearing on the motion, including a description consistent with the defendant's appearance and all the other related factors, clearly supported a conclusion that the testimony of Finn at the trial would not have affected the result. The overwhelming evidence of the defendant's guilt as discussed in later sections of this opinion is further supportive of this conclusion.

Turning now to the allegations concerning the witness Valeri, we note first that it is clear that his testimony presented before the jury detailed evidence, if believed, of the defendant's guilt. The gist of the assertions of the defendant concerning Valeri are shown in the oral testimony and affidavits of defense counsel who interviewed Valeri post-trial, as well as in the oral testimony

and affidavits of two jail inmates who claimed to have conversed with Valeri post-trial. At the trial, Valeri testified, in substance, that he had made no promises, nor had he been threatened, by the prosecution. It is shown that Valeri pleaded guilty to manslaughter and was sentenced to a term of ten to fifteen years from and after other Federal sentences then being served by him. Evidence of counsel and other witnesses at the hearing on the motion for a new trial claimed, in substance, that Valeri had stated after the trial that he had been threatened by the prosecution that, if Valeri did not testify against the defendant Gilday, a first degree murder prosecution would be pursued against Valeri. Further, the claim was that Valeri was promised a sentence concurrent with other Federal sentences then being served by him, in exchange for his testimony against the defendant Gilday.

Valeri testified at the motion for a new trial. He denied that he had made statements concerning threats and promises by the prosecution. He stated that at the trial he had testified truthfully that no such threats or promises had been made to him. The judge found that Valeri had not perjured himself at the trial and that no promises or threats had been made to him. This, in our opinion, is dispositive of the matter. The judge was warranted in his conclusions that Valeri told the truth at the trial and at the hearing on the motion for a new trial. The claim of the defendant has not been established. This is not a case where a criminal conviction has been obtained by the knowing use of false testimony and, consequently, such cases cited by the defendant as *Napue* v. *Illinois*, 360 U. S. 264 (1959), and *Giglio* v. *United States*, 405 U. S. 150 (1972), are not controlling. The motion fails factually in its essential allegations. The judge also concluded in substance that inconsistent statements concerning this issue, presumably made by Valeri to defense counsel post-trial, might impair Valeri's credibility as a witness against the

defendant, but this was not crucial in view of the overwhelming evidence of the defendant's guilt, and should be considered apart from Valeri's testimony at the trial. With this reasoning, also, we concur, as shown at the conclusion of this opinion.

3. The defendant argues that he was denied his constitutional right to a fair trial before an impartial jury based on pre-trial prejudicial publicity. There is no question that the publicity was extensive and persistent after the crimes were committed. Nevertheless, we find no error in the judge's rulings on defendant's motions addressed to the issue.

The judge showed constant vigilance as to the problem, almost from the date of the defendant's arraignment. Thereafter, the judge took every measure which, in our view, was required by the reasonable exercise of his discretion. The crimes occurred on September 23, 1970. The trial commenced with the empanelling of the jury more than sixteen months later, February 8-15, 1972. Although the defendant's motion for a further continuance, filed before commencement of the trial, was denied and the defendant's motion that venue be transferred to another county, filed on the day before the first day of trial, was also denied, there was no error. We reject the defendant's argument that even a showing that there was a possibility of prejudice requires a new trial, in all circumstances. The cases on which he relies, such as *Estes* v. *Texas*, 381 U. S. 532 (1965), and *Sheppard* v. *Maxwell*, 384 U. S. 333 (1966), do not establish that proposition.

The cold-blooded killing of a police officer; the political and revolutionary nuances of the case; the college orientation of the paroled defendant and the other men accused, as well as the defendants Power and Saxe; the spectacular and crime-ridden flight of the defendant after the crime; these and other aspects aroused the interest of the public and news media. However, the judge continued the trial date for more than ten months

from the original date requested, and he addressed all potential jurors in the strongest language as to publicity and its possible effect on them. The judge's interrogation of individual jurors was resourceful and thorough; he invited suggestions from counsel for questions to be put by the court to jurors as to publicity. His interrogation of the jurors as to matters of prejudice was painstaking and resourceful, and he resolved all doubts in favor of the defendant. He sequestered the jury after empanelling. He made requests for cooperation from the news media that they "be fair and cautious" in their reporting.[1] We think it was within the judge's discretion, in light of the extensive and careful measures taken by him, whether to accept, without more, the declaration of the jurors as to their disinterest and freedom from emotional or intellectual commitment. *Commonwealth* v. *Subilosky,* 352 Mass. 153, 159 (1967). *Commonwealth* v. *Nassar,* 354 Mass. 249, 253-254 (1968). *Commonwealth* v. *Vitello, ante,* 224 (1975).

We have in mind that the judge was entitled to weigh, with all other relevant considerations, the possible effect of further continuances on the Commonwealth's interests in prosecution of the defendant. We take notice that successive and prolonged continuances of the trial may tend to weaken the credibility of identifying, and other, witnesses.

Most particularly we note that the final continuance, requested by the defendant just before trial commenced, and presumably his motion for change of venue filed about that same time, were occasioned by renewed publicity caused by the defendant's attempted escape from Charles Street jail in January of 1972. The judge clearly,

---

[1] We give no serious consideration to suggestions by the defendant, as shown by motions "for a fair trial" filed almost immediately after his arraignment, that the news media be controlled by court orders. The judge made clear from the beginning his awareness of his public responsibilities under the First Amendment.

and correctly we think, did not treat the defendant's rights to a fair trial before an impartial jury as waived in any measure by reason of the defendant's escape attempt or any other activity on the defendant's part. Nevertheless, the judge could rightfully consider the wilful and highly publicized misconduct of the defendant as a factor in determining whether a further continuance, or change of venue, would be useful in protecting the defendant or the public interest. "That a rash of stories centered about moves for further delay was inevitable; if such could be ground for continuance, cases would never be tried." *Patriarca* v. *United States*, 402 F. 2d 314, 317 (1st Cir. 1968), cert. den. 393 U. S. 1022 (1969).

4. The defendant argues that the judge improperly excused six veniremen from service because of their opinions concerning capital punishment. He contends that, since each of the six veniremen had indicated that he could entertain a verdict of guilty, knowing that the penalty would be death, they should not have been disqualified. However, it is also true, as shown by the record before us, that each of the jurors stated that in the determination of the issue of clemency, his opposition to the death penalty would require him to vote for a penalty of life imprisonment.

It is clear from the statute as it read at the time of this trial that the clemency vote by the jury, after they reach a conclusion that the defendant is guilty of murder in the first degree, must be based on the evidence. General Laws c. 265, § 2, as appearing in St. 1951, c. 203, provides in pertinent part: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and as a part thereof, *upon and after consideration of all the evidence,* recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life" (emphasis supplied). Jurors who could not decide the issue of clemency on the basis of the evidence must of necessity be excluded. See *Common-*

*wealth* v. *Nassar,* 354 Mass. 249, 256-257 (1968). The jurors here were properly excluded from service because they did not stand indifferent on the issue of clemency. We have written extensively on claims somewhat similar to this one and will not repeat here reasoning previously articulated. Cf. *Commonwealth* v. *McAlister,* 365 Mass. 454 (1974); *Commonwealth* v. *Harrington, ante,* 13 (1975). Nor is there merit to the defendant's further argument that the exclusion of such prospective jurors improperly eliminated a class of jurors, within the rule of *Searle* v. *Roman Catholic Bishop of Springfield,* 203 Mass. 493, 499 (1909), thus rendering the Commonwealth's right of peremptory challenge more valuable. No class of jurors was excluded here, but only a small number of persons who disclosed by their statements that they were incapable of performing all of the duties required of them by the law as shown in G. L. c. 265, § 2. See *Commonwealth* v. *McAlister, supra; Commonwealth* v. *Stillwell,* 366 Mass. 1 (1974); *Commonwealth* v. *Harrington, supra.*

5. The defendant asserts that there was a violation of due process of law in that a document was shown to the defendant on cross-examination by the assistant district attorney and the defendant was then asked if he was the author of the document. There was no error. The defendant denied writing the document, and the matter was not pursued further. The paper was not offered in evidence, and it was never shown to the jury, nor were its contents in any way disclosed to the jury. Thus no prejudice has been shown.

6. The defendant asserts constitutional error in the admission in evidence of the in-court identification of the defendant by the witness Becker, as well as allowing evidence of pre-trial identification by Becker of a photograph of the defendant. There was no error.

The defendant correctly does not argue that there was a denial of the right to counsel at the photographic identification, since there is no right. *United States* v.

*Ash,* 413 U. S. 300 (1973). Rather the argument is that the pre-trial photographic procedures were so suggestive as to amount to a denial of due process of law. The judge made careful findings of fact, obviously and appropriately guided by the criteria set out in *United States* v. *Wade,* 388 U. S. 218, 241-242 (1967). We have examined his findings and the totality of the evidence in accordance with the controlling principles as shown in *Stovall* v. *Denno,* 388 U. S. 293 (1967), and *Simmons* v. *United States,* 390 U. S. 377 (1968), and we conclude that the out-of-court procedures were not so impermissibly suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process of law under the Fourteenth Amendment. Cf. *Commonwealth* v. *Ross,* 361 Mass. 665, 672-675 (1972). In particular, the witness had picked the defendant's picture from among nine photographs of men who were reasonably like him in appearance. While the witness's testimony had inherent weaknesses, consisting in particular of his failure just after the robbery to make a verbal description to the police of the man he saw (cf. *United States* v. *Wade,* 388 U. S. 218, 241-242 [1967]), these, in the absence of constitutional defects, were matters for consideration by the jury as to the weight of the testimony of the witness.

In urging constitutional error in permitting identification testimony by the witness Gaudette, the defendant offers the same argument as that addressed to the testimony of Becker. Gaudette testified to a prior photographic identification of the defendant. Again, like Becker, he picked out the defendant's picture from among photographs of nine men who were substantially similar to the defendant in appearance. Once more the judge made extensive findings of fact. In light of those findings and the totality of the evidence, it is clear that the proceedings as to Gaudette also were not "so impermissibly suggestive as to give rise to a very

substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U. S. 377, 384 (1968).

7. The defendant argues that the evidence of his flight should have been excluded. He concedes that evidence of flight indicates consciousness of guilt, and is generally admissible in evidence to prove a defendant's guilty state of mind, even if the evidence is otherwise prejudicial. *Commonwealth* v. *Haney,* 358 Mass. 304, 306 (1970). *Commonwealth* v. *Smith,* 1 Mass. App. Ct. 545 (1973). Nevertheless, he contends that the probative value of the evidence of flight to show consciousness of guilt was so outweighed by the prejudicial effect of the introduction of evidence of other crimes that it resulted in constitutional error. We disagree. The evidence of flight here included a showing of a running gunfight with police, in which an officer was wounded, and two separate kidnappings. Even assuming that in some cases evidence of flight to show consciousness of guilt is of small probative value (cf. *Alberty* v. *United States,* 162 U. S. 499, 511 [1896]; *Wong Sun* v. *United States,* 371 U. S. 471, 483, n. 10 [1963]), we believe that the desperate nature of the defendant's conduct here lent credibility to the Commonwealth's argument that the evidence of flight supported an inference of guilt of the crimes charged.

8. The defendant argues constitutional error in the assistant district attorney's repeated references to the defendant, in the Commonwealth's closing argument, as an "old pro." He contends that this was an oblique and unfair attempt to inform the jury that the defendant had a prior record of serious crimes. Evidence of prior criminal convictions of the defendant had been excluded at the trial. The short answer to the argument is that no objection to the references was made by defense counsel until the morning after the prosecutor's argument was made, that argument having been made in the afternoon. Therefore the defendant now brings nothing before us. *Commonwealth* v. *Stone,* 366 Mass. 506, 512 (1974).

The judge made general and careful reference in his charge to the principle that arguments are not evidence. If at that tardy hour he had made specific reference to the disputed argument, there is good ground for thinking that undue emphasis would have been placed on the phrase to which the defendant now objects.

It can also be reasonably said that the argument of defense counsel encouraged language in kind by the prosecutor. The phrase "old pro" impresses us as a reasonably apt response to certain defense arguments, including references by defense counsel to the defendant as an "ex-con" an "old man" and a "drunk." Further, the entire evidence supported an inference that the defendant had familiarity with the ways of crime and preparation for crimes. Although we have concluded that the prosecutor's remarks did not rise to the level of constitutional error and without contradicting any of our above statements we add that the phrase the "old pro" was the type of hyperbole which might better have been avoided in the prosecutor's argument. *Commonwealth* v. *DeChristoforo*, 360 Mass. 531 (1971). *Donnelly* v. *DeChristoforo*, 416 U. S. 637 (1974). *Commonwealth* v. *Coleman*, 366 Mass. 705, 713-715 (1975).

9. Finally, the defendant argues that the judge's charge to the jury was erroneous in that it permitted the jury to convict on a preponderance of the evidence. The argument centers on that part of the charge in which the judge invited the jury to consider "vital action" taken by them in their "everyday lives," and the weighing of "the pros and cons" preparatory to a decision. There was no error. The judge did not refer to any specific types of important decisions from the lives of the jurors, such as the examples we cautioned against in the case of *Commonwealth* v. *Bumpus*, 362 Mass. 672, 682 (1972), where we said, "The inherent difficulty in using such examples is that, while they may assist in explaining the seriousness of the decision before the jury, they may not be illustrative of the degree of certainty required."

Cf. *Commonwealth* v. *Ferguson,* 365 Mass. 1, 12 (1974); *Commonwealth* v. *Coleman,* 366 Mass. 705, 712 (1975). The judge, in discussing the decisions from everyday lives, specifically emphasized to the jury the requirement for moral certainty in reaching a decision. We do not construe the charge as in any way diluting the Commonwealth's burden of proving the case beyond a reasonable doubt. The charge as to reasonable doubt, in its entirety, was reflective of the long-accepted language of our cases. E.g., *Commonwealth* v. *Webster,* 5 Cush. 295, 319-320 (1850).

10. We have reviewed the entire record as required of us in murder cases under G. L. c. 278, § 33E. We find no reason to afford relief to the defendant under that statute. Clearly justice does not require that we set aside the jury's verdict that the defendant was guilty of first degree murder and the subsequent sentencing of the defendant to life imprisonment.

Our review of the entire record impels us to comment further as to the weight of the evidence against the defendant. We have found no error in the conduct of the trial. The defendant received a fair trial by reason of the foresight and skill of the trial judge, as shown by the judge's obvious and constant attention to the defendant's rights as well as to the public interest.[2] Nevertheless, if error, constitutional or otherwise, had been demonstrated, there is no doubt that we would have given serious consideration to the application of the harmless error doctrine.

We appreciate that we should apply the principle of harmless error with restraint, particularly in the face of asserted constitutional error. The peril to the defendant's rights is obvious in any process wherein the appellate

---

[2] The judge's performance is all the more remarkable when it is considered in light of the disruptive conduct of the defendant during trial, which required the defendant's confinement outside the court room, with electronic communications.

court speculates, long after the fact, as to the jury's reasoning if the case as presented before them had been different. Nevertheless, if error had been shown in any of the several particulars urged by the defendant, a persuasive case could be made that it was harmless beyond a reasonable doubt.[3]

We agree with the trial judge's specific conclusion, in his findings of fact on the motion for a new trial, that the evidence of the defendant's guilt was overwhelming even if only the Commonwealth's case in chief is considered. The case for applying the harmless error doctrine, if that were necessary, becomes even more persuasive when the extraordinary admissions of the defendant on the witness stand[4] as well as the testimony of the witness Bond are also considered.

*Judgments affirmed.*

---

[3] The case of *Chapman* v. *California*, 386 U. S. 18, 24 (1967), held that constitutional error could, consistent with the Constitution of the United States, be deemed harmless only if the reviewing court could "declare a belief that it was harmless beyond a reasonable doubt." See *Schneble* v. *Florida*, 405 U. S. 427 (1972). We are aware also that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error. E.g., *Tumey* v. *Ohio*, 273 U. S. 510 (1927) (impartial judge), *Payne* v. *Arkansas*, 356 U. S. 560 (1958) (coerced confession), and *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (right to counsel).

[4] We consider the defendant's testimony only as it supplied support for the case the Commonwealth presented, viz., that the defendant fired the shots that killed Officer Schroeder. The admissions of the defendant on the witness stand would have been even more extraordinary if the Commonwealth had chosen to proceed on proof that the defendant was an accessory before the fact. See G. L. c. 274, § 3, which provides that an accessory before the fact may be indicted, convicted and punished as a principal to the substantive felony. Among other things the defendant testified that he procured the guns and an automobile that were used in the bank robbery; that he stole a license plate and affixed it to another of the vehicles used in the robbery; that he disposed of one of the vehicles after the robbery; that he took a substantial share of the loot; and that he knew Bond, Valeri and the two girls were planning something but did not know exactly what.